24 A.3d 251

MING YU HE AND JINFANG HE, HER HUSBAND, PLAINTIFFS-RESPONDENTS, v. ENILMA MILLER, DEFENDANT-APPELLANT, AND RANDY MILLER, DEFENDANT.

Argued October 12, 2010—Decided May 12, 2011.

234

*Michael J. Marotte* argued the cause for appellant (*Schenck, Price, Smith & King,* attorneys; *Mr. Marotte* and *Sandra Calvert Nathans,* on the briefs).

*August R. Soltis* argued the cause for respondents.

*William C. Carey* argued the cause for amicus curiae Insurance Council of New Jersey (*McElroy, Deutsch, Mulvaney & Carpenter,* attorneys).

*Amos C. Gern* argued the cause for amicus curiae New Jersey Association for Justice (*Starr, Gern, Davison & Rubin,* attorneys; *Mr. Gern* and *Robert C. Sanfilippo,* on the brief).

*Gerald H. Baker* argued the cause for amicus curiae New Jersey State Bar Association (*Richard H. Steen,* President, attorneys; *Mr. Baker* and *Mr. Steen,* on the brief).

Justice HOENS delivered the opinion of the Court.

This appeal, and its complex procedural path, starkly illustrates the profound difficulties that our trial courts and appellate tribunals continue to encounter as they seek to understand and apply the concepts surrounding remittitur. As such, it challenges this Court to create a workable template to guide both the trial and appellate courts when they are called upon to apply the remittitur device. In addressing the issues on appeal, however, we endeavor to make plain the circumstances in which remittitur can and must operate, for only through that effort can we ensure that remittitur is reserved for the few cases in which it is appropriate and proceeds upon a record sufficient to withstand appellate scrutiny.

The complicated route the case has taken on its way to review by this Court bears brief recitation because it serves as an example of the inherent difficulties such disputes present. In short, a jury found in favor of an injured plaintiff, returning a verdict that included past and future lost wages and, significant to our appeal, an award for plaintiff's pain and suffering and for her spouse's loss of consortium. The trial court, for reasons set forth on the record and in writing, concluded that the awards for pain and suffering and for loss of consortium constituted a "miscarriage of justice under the law," and "shock[ed] the judicial conscience." On that basis, the trial court granted defendant's remittitur motion.

The Appellate Division granted plaintiff's motion for leave to appeal, reversed the remittitur order, and directed that the jury's verdict be reinstated. Upon defendant's petition, this Court then summarily reversed in part and remanded to the trial court with instructions to conduct a "complete and searching analysis," after which the Appellate Division was ordered to "reconsider its judgment in light of the findings developed on remand." *He v. Miller,*

199 *N.J.* 538, 539, 973 *A.*2d 943 (2009). Complying with those instructions, the trial court issued an amplified statement of reasons, describing the cases to which it had looked for comparison and again concluding that the awards for pain and suffering and loss of consortium could not stand. The Appellate Division again disagreed, however, concluding that the record fell short of what the remittitur rule requires.

The competing views expressed by the trial and appellate courts, stated at each step with increasing conviction, cry out for this Court to make clear how the remittitur rule is to be applied and the circumstances in which its application is appropriate. Those circumstances, as we have long held, are not the common ones in which a trial or appellate court might have evaluated damages in a manner less generous than the award that the jury chose, but are the unusual ones in which the jury's damage award is indeed shocking to the judicial conscience.

In establishing the framework for consideration of a grant of remittitur, however, we again remind our trial courts that if they conclude that remittitur should be applied, their reasoning must be carefully explained and their decision supported by a record sufficient for review on appeal. Moreover, we reiterate that the appellate court, in performing its review, likewise must refrain from merely substituting its differing opinion without appropriate deference to the trial court and an equally careful articulation of reasons.

In the end, we conclude that this jury's award cannot stand because the trial court's explanation of its reasons for reaching that conclusion and the factual basis on which it acted were sufficient, and the appellate panel's contrary view was based on a misapplication of our settled precedents.

## I.

We derive the facts from the record created during the trial of plaintiffs' claims, but our recitation is bounded by the narrow focus of the issue presented in this appeal. In particular, in light

of the applicable standard of review, we need not describe the evidence produced by defendant that tended to cast doubt on plaintiffs' claims, but instead we only set forth the proofs in the light most favorable to plaintiffs. *See Johnson v. Scaccetti,* 192 *N.J.* 256, 281, 927 *A.*2d 1269 (2007).

### A.

Plaintiff Ming Yu He[1] was injured in an automobile accident with defendant Enilma Miller[2] on October 28, 2003. Plaintiff testified that the impact caused her to "pass out," that the airbags deployed, and that her vehicle traveled off of the roadway and came to rest "in front of some trees." She could not recall if she hit her head during the collision, but testified that after she was "awake again" her head, neck and hands were aching. She described her pain as having been "serious" and she was transported to the hospital, where she was examined and released the same day.

Starting the next day, plaintiff had, by her estimation, two or three visits with a chiropractor. He treated her with over-the-counter medications and physical therapy, which did not alleviate her pain. She next came under the care of a physiatrist who also attempted conservative therapies before ordering MRI studies to better assess plaintiff's condition. The MRI films, taken two months after the accident, revealed two herniated discs in her cervical spine, one of which impinged on the spinal cord, and three herniations in her lumbar spine, accompanied by evidence of pre-existing degenerative disc disease.

---

[1] We refer to plaintiff Ming Yu He, who sustained personal injuries in the automobile accident, as plaintiff, and to her spouse, Jinfang He, who pursued a claim for loss of services and loss of consortium, as co-plaintiff simply for ease of reference.

[2] The claims against co-defendant Randy Miller, who was sued in his capacity as the vehicle's owner, were dismissed by stipulation before trial.

The physiatrist also referred plaintiff to a pain management doctor who, plaintiff estimated, performed thirty to forty acupuncture treatments. In addition, both of these health care providers treated plaintiff with epidural injections of cortisone into her cervical and lumbar spine. Because all these forms of treatment provided only temporary relief, plaintiff was referred to a neurosurgeon. Following his review of additional MRI studies, the neurosurgeon recommended that plaintiff forgo surgery, in light of its risks. At the time of trial, plaintiff was continuing to be treated by the physiatrist with prescription narcotics for pain relief.

At trial, plaintiff testified about how her injuries affected her life. She explained that she had previously been employed as a housekeeper in a New York City hotel, but had been unable to return to that job because her injuries impaired her ability to do the heavy physical work it involved. She offered documentary proofs that her past lost wages, representing approximately four and one-half years, were $110,194.55 and testified that, prior to her accident, she expected to work until reaching age sixty-seven, a period of twenty years. Plaintiff also expressed her feelings about not being able to return to her job, describing it as a job she "kind of like[d]" and "treasure[d]," and saying that "a job like that is not easy to find."

In addition, plaintiff presented the testimony of an expert occupational therapist and vocational evaluator who had performed an assessment of plaintiff's ability to secure employment. That expert testified that the physical limitations plaintiff had because of the injuries she sustained in the car accident precluded her from returning to her job as a hotel housekeeper. In addition, the expert opined that plaintiff's physical ailments, together with her limited English language skills, her lack of formal education beyond high school, and the fact that she had no other transferable job skills, combined to leave her without the ability to return to other forms of unskilled labor.

At trial, plaintiff also testified about the impact that her injuries have had on her life. She explained that she has pain in her neck and back that sometimes travels to her head or to her hands, causing her to drop items. She testified that she can perform self-care tasks, but her ability to do household chores is limited. Plaintiff testified that she was particularly affected by her increased need to rely on her parents for help, because she had brought them from China to reside with her family, expecting that they would be able to rest and enjoy life while she cared for them. She described herself as "feel[ing] kind of useless" because she had to depend on family members to help her. Finally, she and her husband testified about the impact of her injuries on their marriage, explaining that they were no longer able to engage in sexual relations because of the pain she felt when trying to do so.

Plaintiff's claims were tried over the course of four days in February 2008. After deliberations, the jury found that defendant was negligent and was the sole proximate cause of the accident. It then awarded plaintiff $110,000 in damages for her past lost wages and $500,000 for her future lost wages. The jury also found that plaintiff had sustained a permanent injury in the accident and returned a non-economic award in the amount of $1,000,000 for plaintiff and an award in the amount of $100,000 for her husband, the co-plaintiff, on his per quod claim.

### B.

Defendant moved for a new trial or, in the alternative, remittitur. After hearing from the parties, the court granted that alternative form of relief, reducing the non-economic award to $200,000 and the per quod award to $20,000. The trial court expressed the basis for its conclusion, commenting in relevant part:

> During the course of the trial, the court had the opportunity to observe Miss He. Miss He was able to sit for long periods of time and her gait did not appear to [be] affected by her injuries. Further, Miss He did not outwardly display any signs that she was experiencing pain or discomfort ... Based upon the fact that surgery was never recommended for Miss He, that she has degenerative disc disease, that

she is able to care for herself, drive a motor vehicle and perform light housekeeping, as well as the fact that she did not appear to be experiencing pain and suffering during the course of the trial and was able to sit for long periods of time during the trial, I find that the jury award of $1M to Miss He for her injuries constitutes a manifest injustice that shocks the judicial conscience.

The trial court subsequently amplified its oral opinion in writing, *see R.* 2:5–1(b), explaining why the economic damages were not "fairly separable" from the non-economic damages, and that, if plaintiff rejected the remittitur, a new trial on all damages would be required. *See Caldwell v. Haynes,* 136 *N.J.* 422, 442, 643 *A.2d* 564 (1994) (requiring new trial on all issues after remittitur rejected because remitted award was not "fairly separable" from lost wage awards).

Plaintiff was unwilling to accept the remittitur or proceed with a new trial on damages, instead electing to seek leave to appeal. The Appellate Division granted that motion and, for reasons expressed in an unpublished opinion, reversed the trial court's order and directed that the original verdict be reinstated. The appellate court quoted a number of decisions of this Court that set forth the essential principles governing remittitur before turning to criticize two aspects of the trial court's analysis.

First, the panel concluded that factual evidence on which the trial court relied was inadequate, commenting that

the sole basis for the court's decision to remit the pain and suffering and per quod awards is the fact that no doctor recommended that plaintiff undergo surgery, she was still able to care for herself, drive a vehicle, had degenerative disc disease, did not visibly appear to be experiencing pain and suffering during the course of the trial, and was able to sit for long periods during the trial.

Pointing out that the jury was free to accept or reject plaintiff's evidence and testimony, and relying on a recitation from the jury charge that instructs jurors about how to evaluate the evidence in arriving at a just verdict, *see Model Jury Charge (Civil)* 8.11E, the panel found that the trial court had invaded the jury's proper province.

Second, the appellate panel criticized the basis on which the trial court had made its comparative analysis. In particular, the panel pointed out that although the trial court had reviewed

several recent jury verdicts that defendant's counsel had called to the court's attention in support of its motion, the court "made no reference to any of the verdicts referenced, or to the court's particular experience in presiding over similar cases from which vastly different verdicts emerged." The appellate panel repeated this Court's admonition that "[a]lthough the [trial] court may rely on its knowledge of other injury verdicts, if it does so, it must give a factual analysis of how the award is different or similar to others to which it is compared." *Johnson, supra,* 192 *N.J.* at 281, 927 *A.*2d 1269 (citing *Fertile v. St. Michael's Med. Ctr.,* 169 *N.J.* 481, 500–01, 779 *A.*2d 1078 (2001)).

The appellate court remarked as well on the difference between the trial court's approach to the jury's awards for past and future wage loss and its analysis of the non-economic awards. The panel commented: "we find it difficult to understand that the court could accept the jury's award for past and future lost earnings but not its award for pain and suffering and the per quod verdict." In summary, the court found the trial court's expression of reasons inadequate to support its order remitting the awards, and directed that the jury's verdict be reinstated.

Defendant next sought relief from this Court, which resulted in our order directing that:

> the matter is remanded to the Law Division for a complete and searching analysis under *Johnson, supra,* including "a factual analysis of how the award is different or similar to others to which it is compared[,]" *id.* at 281 [927 *A.*2d 1269], and, thereafter, the Appellate Division is to reconsider its judgment in light of the findings developed on remand.
>
> [*He, supra,* 199 *N.J.* at 539, 973 *A.*2d 943.]

## C.

On remand, the trial court prepared a written opinion that explained the basis for its decision to grant the remittitur motion in greater detail. In relevant part, the court set forth the facts and allegations of the trials that it had concluded were factually comparable, but that had resulted in far lower verdicts for pain and suffering than the jury had awarded these plaintiffs. Those

other cases included two over which the court had presided and six others that the defendant had called to the court's attention. Candidly conceding that none was identical to plaintiff's accident or her injuries, the court nevertheless was able to draw some comparisons.

The cases taken to verdict and over which the trial court had presided included [3] *Morales v. Keith,* MRS–L–1496–05, which involved a younger plaintiff, also injured in a car accident, and who also had same-day treatment at a hospital, followed by orthopedic and chiropractic treatment for a lumbar herniation and a cervical disc bulge. That plaintiff's accident was dissimilar to the extent that it caused bilateral carpal tunnel syndrome, which required surgery. It was similar, however, because that plaintiff continued to experience neck and back pain and remained disabled to the extent of significant limitations on his ability to work and drive. The jury in that trial returned a damages award of $2500, which the parties agreed to increase by approximately $46,000.

The second trial over which the trial court had presided, and to which it pointed in comparison, was *Ziza v. Romanelli,* MRS–L–2080–05, in which a middle-aged woman fell, injuring her ankle and later developing reflex sympathetic dystrophy. After numerous physical therapy sessions, pain injections, and nerve block procedures that gave her little relief, she had a spinal cord stimulator surgically implanted into her back. At the time of trial, the stimulator was operating twenty-four hours each and every day, but she was still experiencing pain. The injury forced her to stop working in her family's bakery business and her lifestyle and marital relations were impaired. The gross jury award in that trial was $200,000, together with a $25,000 per quod award.

---

[3] Although *R.* 1:36–3 precludes citation to unpublished opinions, because the trial court relied upon the verdicts in these cases on remand, we refer to them as part of explaining the factual basis on which the trial court reached its conclusion on the remittitur motion.

On remand, the trial court also referred to reports of six trials that defendant offered for comparison, two of which were also venued in the Morris/Sussex vicinage and four of which were tried elsewhere. As the trial court had not personally presided over them, its knowledge was less detailed, but the court set forth the available facts and drew comparisons based on those facts. The two Morris County cases included: (1) a plaintiff who, after being hit by a car, suffered two lumbar disc herniations, underwent back surgery, and to whom the jury awarded $200,000; and (2) a car accident plaintiff who had two cervical disc herniations that were treated without surgery and to whom the jury awarded $150,000. The four out-of-vicinage matters were described as: (1) a plaintiff who underwent surgery for two lumbar disc herniations and was awarded $50,000; (2) a plaintiff who had cervical and lumbar disc herniations at multiple levels, along with a disc protrusion, and who was awarded $100,000; (3) a car accident plaintiff who underwent epidural injections for a lumbar disc herniation, was forced to give up his job as a taxi driver, and was awarded $50,000; and (4) a plaintiff who suffered three cervical disc herniations and a cervical disc bulge, was treated with non-surgical orthopedic interventions and epidural injections, and was awarded $40,000 by the jury.

Conceding that the facts and circumstances of the particular plaintiffs in the examples provided by defendant were "limited," the trial court explained the methodology it used in making its comparison. In relevant part, that explanation and reasoning was summarized as follows:

> Specifically, in each case plaintiff suffered spinal injuries following an accident. In addition, the course of treatment which the plaintiffs underwent, to varying degrees, is akin to that which Plaintiff received in this matter. The cases establish a spectrum of jury awards which ranges between $40,000.00 and $200,000.00. Notably, even in those cases where major invasive surgery was indicated and/or performed, the jury award did not exceed $200,000.00. In making its comparative analysis, the [c]ourt could not help but recognize the great disparity between the award in this matter and those rendered in the cited cases where the plaintiffs sustained similarly serious injuries and, in several cases, required surgery.

In short, the trial court compared the other cases by evaluating the severity of those injuries, in part using as a yardstick the type of medical intervention or treatment required, and concluding that the range of gross awards for "similarly serious injuries" was significantly less than the non-economic award here.

In addition to its explanation of that specific data, the trial court referred to "its own knowledge and experience as a trial attorney for approximately twenty-two years [and as] a Certified Civil Trial Attorney, [during which time the court had] focused ... largely on plaintiffs' personal injury matters venued in Morris County." Moreover, the court explained that as a result of that experience it had both worked on and become aware of "countless" verdicts and arbitration awards returned in favor of plaintiffs. Although those plaintiffs had injuries, treatment, and resulting life experiences that were similar to this plaintiff's, none had resulted in such a high damage award. In the trial court's words:

> During that time, the [c]ourt worked on a myriad of matters involving spinal injuries which had a serious impact on the client's lifestyle. In addition, the [c]ourt was aware of countless other arbitration awards and jury verdicts involving injuries similar to those sustained by Plaintiff.[ ] Despite the [c]ourt's experience and in light of Plaintiff's injuries in this matter, the [c]ourt could not recall an award which was equal to the amount of the jury award in this case.

In addition, the trial court commented on its "feel of the case" by commenting that

> the [c]ourt was afforded the opportunity to observe the Plaintiff. She was able to sit for long periods of time without any visible signs of pain or discomfort. She was able to enter and exit the courtroom without assistance or any apparent difficulty. Plaintiff's gait and appearance did not appear to be in any way affected by her injuries. Overall, there were no outward signs of pain or discomfort observable during the course of the trial.

Based upon the several verdicts in cases with which the court was either personally familiar or that had been called to its attention, the court's lengthy prior experience in similar matters, and its articulation of the basis for its "feel of the case," the trial court reiterated its conclusion that the verdict returned by the jury for non-economic damages was shockingly high, and that remittitur was appropriate.

### D.

Plaintiffs again appealed, arguing that the trial court had erred and requesting that the original verdict be restored. In a published opinion, the Appellate Division again reversed the trial court's remittitur and reinstated the jury's verdict. *He v. Miller*, 411 *N.J.Super.* 15, 19, 983 *A.*2d 1164 (App.Div.2009).

The appellate panel began by reviewing this Court's most recent decision concerning a trial court's power to set aside damage awards. *Id.* at 26, 983 *A.*2d 1164 (citing *Jastram v. Kruse*, 197 *N.J.* 216, 228, 962 *A.*2d 503 (2008)). The panel noted that the court's power is limited and that a trial judge's review "must be grounded substantially in the 'totality of the evidence' in the record." *Id.* at 27, 983 *A.*2d 1164 (citing *Jastram, supra,* 197 *N.J.* at 229, 962 *A.*2d 503). Conceding that a trial judge "may look beyond the record to judicial 'experience with other injury verdicts,' " the appellate court noted that the trial court that elects to do so must provide a factual analysis of how the award is different from or similar to others. *Id.* at 28, 983 *A.*2d 1164 (citing *Fertile, supra,* 169 *N.J.* at 501, 779 *A.*2d 1078).

The panel then took issue with the verdicts on which the trial court had relied. Observing that the plaintiffs in those other cases could be distinguished because, for example, some had injuries to body parts other than the spine or were not the same age as plaintiff, the panel concluded that those verdicts gave only "superficial support for the judge's conclusion, . . . [because the record] reveals little about those particular plaintiffs and their own unique lives." *Id.* at 30, 983 *A.*2d 1164.

The panel also rejected the trial court's "feel of the case" observations as "an inappropriate yardstick by which to measure defendant's claim of excessiveness." *Id.* at 33, 983 *A.*2d 1164. Describing those observations as things that could have been seen by the jury, the appellate panel accorded the trial court's view only minimal weight. *Id.* at 32, 983 *A.*2d 1164. Finally, the panel found it incongruous that the trial court remitted the pain and

suffering and per quod awards, but left the jury's sizeable awards for past and future lost wages undisturbed. *Ibid.*

Concluding that the trial court had failed to evaluate the evidence in a light most favorable to plaintiff and had inappropriately substituted its feel of the case for that of the jury, the panel again reversed the trial court and directed that the jury verdict be reinstated. *Id.* at 33–35, 983 *A.*2d 1164. In part, the panel offered its own rationale, commenting that "verdicts that fall outside a predictable range are not per se excessive." *Id.* at 34, 983 *A.*2d 1164. In its view, merely because this award was "outside a predictable range," did not make it one that was so "wide of the mark" that remittitur was appropriate. *Id.* at 34–35, 983 *A.*2d 1164.

Defendant again petitioned this Court for certification, which we granted. 201 *N.J.* 446, 992 *A.*2d 3 (2010). We thereafter granted leave to the New Jersey State Bar Association (NJSBA), the New Jersey Association for Justice (NJAJ), and the Insurance Council of New Jersey (ICNJ) to participate as amici curiae.

## II.

Defendant advances three arguments in this appeal. First, defendant asserts that the Appellate Division's reliance on "unique lives" in its evaluation of the verdicts offered for comparison was so restrictive that, if endorsed by this Court, it will be virtually impossible for any trial court to order remittitur. Second, defendant asserts that the Appellate Division erred by discounting the trial court's "feel of the case" observations and failing to defer to those views. Third, defendant contends that the Appellate Division's overall conclusion that the verdict was not excessive is unsupported and erroneous.

Plaintiffs offer three arguments in support of the Appellate Division's judgment. First, they contend that the Appellate Division did not narrowly limit or curtail the authority of the trial court to employ remittitur, but appropriately abided by this Court's precedents. Second, plaintiffs contend that it was inap-

propriate for the trial court to use the verdicts cited by defendant for comparison because the trial court possessed no first-hand experience with those trials. Finally, they echo the panel's observation that it is incongruous for the court to assert that the award for pain and suffering was "shocking" to the judicial conscience, while leaving the other damage awards undisturbed.

Amicus NJSBA asks this Court to restrict any review of a jury's award to evidence in the trial record, thus precluding any comparison to other verdicts or to the trial judge's personal experiences. In the alternative, NJSBA argues that if this Court decides to allow comparisons, it must establish precise procedures to give parties advance notice and an opportunity to be heard about the matters proposed for comparison.

Amicus NJAJ urges this Court to affirm the Appellate Division judgment. Although conceding that it is unrealistic to expect a trial judge to overlook his or her own experience when deciding a remittitur motion, NJAJ argues that the record is insufficient to sustain this trial court's conclusion. NJAJ recognizes that comparisons might be appropriate, but asks this Court to require the use of a "totally objective" standard in evaluating comparisons.

Amicus ICNJ, in contrast, expresses concern that, if affirmed, the Appellate Division's approach "will erode or improperly limit judicial control over exorbitant verdicts." ICNJ asserts that reasonable comparisons with similar awards should be permitted lest trial courts be left with only their "intuitive[ ] feeling that a verdict is inadequate or excessive." Pointing next to the Appellate Division's concession that the claim of excessiveness of the award here was a close call, ICNJ argues that the appellate court should have deferred to the trial court. Finally, ICNJ goes a step further, asking this Court to modify the "shock the conscience" standard, and to substitute for it an approach that would permit the trial court to decide "whether in good conscience a verdict should stand."

### III.

The general principles that govern remittitur are familiar ones, but they are so central to our analysis of this appeal that we review them briefly. The authority to apply remittitur springs from the court's power to grant a new trial. *See R.* 4:49–1. That power may be exercised when "having given due regard to the opportunity of the jury to pass upon the credibility of the witnesses, it clearly and convincingly appears that there was a miscarriage of justice under the law." *Ibid.; see also Carrino v. Novotny,* 78 *N.J.* 355, 360–61 & n. 2, 396 *A.*2d 561 (1979) (describing evolution of standard).

The corollary power to order remittitur is a special device through which the court addresses a jury's excessive award of damages. A remittitur order is actually an alternative to ordering a new trial. That is, it " 'describes the power of a court upon a motion for a new trial due to excessive damages rendered by a jury to require the plaintiff to consent to a decrease in the award to a specified amount as a condition for denial of the motion.' " *Fertile, supra,* 169 *N.J.* at 491, 779 *A.*2d 1078 (2001) (quoting S.T. Rayburn, *Statutory Authorization of Additur and Remittitur,* 43 *Miss. L.J.* 107, 107 (1972)). It is a device through which a plaintiff consents to a reduced award instead of facing the new trial on damages that defendant demands. *Ibid.* (citing *Henker v. Preybylowski,* 216 *N.J.Super.* 513, 516, 524 *A.*2d 455 (App.Div.1987)).

We have encouraged trial courts to use remittitur when warranted so as to avoid the unnecessary expense and delay of a new trial. *Id.* at 492, 779 *A.*2d 1078; *Baxter v. Fairmont Food Co.,* 74 *N.J.* 588, 595, 379 *A.*2d 225 (1977). The power of remittitur is not to be exercised lightly, however, because we repose enormous faith in the ability of juries to equate damages with dollars to "make the plaintiff whole, so far as money can do." *Model Jury Charge (Civil)* 8.11E. We rely on juries to perform that task while recognizing that "[a]ssigning a monetary value to pain-and-suffering compensation is difficult because that kind of harm is 'not

gauged by any established graduated scale.' " *Caldwell, supra,* 136 *N.J.* at 442, 643 *A.2d* 564 (quoting *Cernak v. Hertz Corp.,* 53 *N.J.Super.* 455, 465, 147 *A.2d* 800 (App.Div.1958), *aff'd,* 28 *N.J.* 568, 147 *A.2d* 795 (1959)); *see also Johnson, supra,* 192 *N.J.* at 279–80, 927 *A.2d* 1269 (noting that such damages "are not susceptible to scientific precision ... because there is no neat formula for translating pain and suffering into monetary compensation"). But a jury's authority is not unbounded and we have explained that "[o]ur role in assessing a jury verdict for excessiveness is to assure that compensatory damages awarded to a plaintiff 'encompass no more than the amount that will make the plaintiff whole[.]' " *Jastram, supra,* 197 *N.J.* at 228, 962 *A.2d* 503 (quoting *Caldwell, supra,* 136 *N.J.* at 433, 643 *A.2d* 564).

 A trial court, faced with a jury verdict that the court concludes is excessive, may order a new trial or, alternatively, remittitur, bearing in mind that its power is "limited." *Carey v. Lovett,* 132 *N.J.* 44, 66, 622 *A.2d* 1279 (1993). The trial court should not disturb the jury's award unless it is "so disproportionate to the injury and resulting disability as to shock the conscience and [convince the court] that to sustain the award would be manifestly unjust." *Baxter, supra,* 74 *N.J.* at 604, 379 *A.2d* 225 (quotation omitted) (alteration in original). As this Court has described the standard to be applied, the verdict may only be set aside if it is " 'wide of the mark' and pervaded by a sense of 'wrongness.' " *Johnson, supra,* 192 *N.J.* at 281, 927 *A.2d* 1269 (quoting *Baxter, supra,* 74 *N.J.* at 598–99, 379 *A.2d* 225).

 Because of our faith in the ability of juries to perform the weighty task of making an injured plaintiff whole through a "fair and reasonable award of damages," *see Model Jury Charge (Civil)* 8.11E, we begin with the presumption that its verdict is correct, *see Baxter, supra,* 74 *N.J.* at 598, 379 *A.2d* 225, and we direct the court to view the evidence in the light most favorable to plaintiff in evaluating whether remittitur is appropriate. *See Johnson, supra,* 192 *N.J.* at 281, 927 *A.2d* 1269.

██ Although our trial courts must be appropriately deferential to the findings and conclusions of the jury, *see Baxter, supra,* 74 *N.J.* at 598, 379 *A.*2d 225 (recognizing that "[i]n the American system of justice the presumption of correctness of a verdict by a jury has behind it the wisdom of centuries of common law merged into our constitutional framework"), appellate courts must also defer to the "trial courts and their firsthand 'feel of the case' as it bears on an analysis of whether the jury's verdict was motivated by improper influences." *Pellicer v. St. Barnabas Hosp.,* 200 *N.J.* 22, 58, 974 *A.*2d 1070 (2009) (quoting *Baxter, supra,* 74 *N.J.* at 600, 379 *A.*2d 225); *see Fritsche v. Westinghouse Elec. Corp.* 55 *N.J.* 322, 330, 261 *A.*2d 657 (1970) ("[a]n appellate court . . . lacks the opportunity to observe and hear the witnesses who appear before the trial judge and jury"); *Dolson v. Anastasia,* 55 *N.J.* 2, 6, 258 *A.*2d 706 (1969) (noting trial court's ability to take account of "intangible 'feel of the case' . . . gained by presiding over the trial").

██ The power of remittitur therefore is limited, because its purpose is not to bring a generous, but manifestly supportable, verdict down into a range more to the liking of the trial or appellate court. Instead, it is a device to which a court may resort to reduce a verdict that is "shocking" and award in its place "the highest figure that could be supported by the evidence." *Fertile, supra,* 169 *N.J.* at 500, 779 *A.*2d 1078.

In evaluating grants and denials of remittitur, we have fixed few, but significant, boundaries on the manner in which the court arrives at its conclusion that relief from the verdict is appropriate or the grounds on which it makes that decision. We have demanded that the trial court explain how it determined that the verdict was excessive and how it reached the award that it selected as the remitted amount. *Id.* at 501, 779 *A.*2d 1078. We have endorsed, in particular, a trial court's remittitur that "relied on the evidence it saw and heard . . . [and that rested] on its own common knowledge, as well as its experience with other injury verdicts, and . . . on [plaintiff's] extended life expectancy." *Ibid.*

Although a trial court may find support for remittitur by relying on other verdicts, we have cautioned that in doing so "it must give a factual analysis of how the award is different or similar to others to which it is compared." *Johnson, supra,* 192 *N.J.* at 281, 927 *A.*2d 1269; *see Jastram, supra,* 197 *N.J.* at 233–34, 962 *A.*2d 503.

## IV.

This appeal presents the Court with the opportunity to explain in more detail both the basis on which a trial court may rely in ordering remittitur and the level of detail that the court must include in its explanation of the reasons for its decision to grant that remedy. The task is one that this Court approaches with caution, because requiring too little support or too little detail might lead to increased and inappropriate use of a tool reserved for the unusual case, while limiting the potential supporting grounds too much or demanding too great a similarity between plaintiff and the other matters offered for comparison threatens to end any possible resort to the remittitur device.

Likewise, this appeal calls upon this Court to consider the different roles played by our trial and appellate courts in passing upon the question of whether the verdict is one which calls for remittitur, the deference owed by our courts to the jury's verdict, and the deference to be accorded the trial court's expressions of its "feel of the case" by the appellate tribunal. Each of these several considerations, and the proper role assigned to each, demand that we identify a framework for the analysis that will serve the ends of justice that we must preserve for both plaintiffs and defendants.

## A.

Several propositions are essential to our analysis. First, the jury is the bedrock of our system of justice. It stands as the institution that we charge with the difficult task of achieving justice through applying its collective wisdom and judgment in evaluating liability and awarding damages. The jury's views of

the facts and the credibility of the witnesses as expressed in its verdict are entitled to deference from both the trial and appellate courts.

Second, remittitur is intended to be used in limited circumstances and is reserved for the unusual case that meets the "shocking" criteria. Maintaining the unique place that we have long assigned to this tool is critical lest it become a device used by courts to substitute their opinions of adequacy of compensation and tread upon the rightful role of the jury.

Third, remittitur serves the specific function of creating an efficient mechanism to address an award of damages that is excessive without requiring the parties to endure the time, expense and uncertainty of a new trial. *See Fertile, supra,* 169 *N.J.* at 492, 779 *A.*2d 1078. It is not an opportunity for either the trial or the appellate court to impose its view of the case on the parties, nor is it a chance for those courts to interfere with an award that is merely generous, albeit sustainable. *See Jastram, supra,* 197 *N.J.* at 230, 962 *A.*2d 503 (citation omitted). Like our cautionary language concerning new trial motions in general, it is not the role of the courts, either at the trial or appellate level, to sit as the decisive juror or substitute their notions of justice for those expressed by the jury. *See Dolson, supra,* 55 *N.J.* at 6, 258 *A.*2d 706 (cautioning that "judge may not substitute his judgment for that of the jury merely because he would have reached the opposite conclusion; he is not a thirteenth and decisive juror").

Fourth, the decision to order a remittitur must spring from an overriding sense of injustice, a shock to the court's conscience, a certain and abiding belief that the award, in light of the facts and the evidence, falls outside the relatively wide range of one that is acceptable and appropriate.

That last observation, however, presupposes that the trial court has an appreciation for where the boundaries of the "wide range of acceptable" are found; it presumes that the court has a preexisting "conscience" that can be shocked in the sense of being

able to recognize an award that falls well outside of the ordinary. More to the point, in light of the admittedly inexact nature of damage awards in personal injury trials, it demands that the trial court be generally cognizant of the parameters of similar cases and similar claims. Inevitably, it is the court's careful articulation of what its perception is and on what it is grounded that will best inform the parties and provide the appellate court with a basis on which to carry out its role.

The careful creation of a record of the court's basis for a grant of remittitur is central to any evaluation of that decision because no two judges are identical and no plaintiff offered for comparative purposes will be a precise match. That is, all judges come to the bench with different backgrounds, experiences, perceptions, and views. One newly appointed to the bench and assigned to a personal injury trial after an entire career handling family law disputes inevitably will have fewer examples readily at hand with which to make a comparison than will a judge who has presided over dozens of personal injury trials or whose career was devoted to litigating such matters. Likewise, judges who have gained experience on the bench in similar trials will have a different, and perhaps better, basis on which to determine whether a particular award is beyond the acceptable to such a degree that it calls for remittitur.

By the same token, no two plaintiffs are identical and no two cases are identical. That inevitably leads to practical constraints, because it will always be impossible to point to an identical case as a comparison. At best, it might be possible to have another plaintiff of the same age, or the same gender, or with a similar injury to the same body part, or with the same job, or the same family responsibilities. But there will never be another case that will match on all, or even most, of those points. Nor will it be possible to find another plaintiff with the same course of treatment or the same ability to articulate his or her experience in terms of pain and suffering. Unless we are to write remittitur out of our legal lexicon, we must accept that precise identity is unachievable.

Those great truths lead to four observations that must guide our analysis. First, it is essential that the court considering remittitur create a meaningful opportunity for the litigants to be heard and to make a record. The court must give each party the chance to bring to the court's attention relevant precedents that advance that party's view of the propriety of remittitur and an opportunity to rebut those offered by his or her opponent. It is essential both for the purpose of letting them attempt to educate the judge as best they can about their reasons for asserting that the award is or is not so "wide of the mark" that remittitur is appropriate and for the purpose of creating a record that will permit appellate review.

Second, identifying for the record, with as much precision as is possible under the circumstances, the particular basis on which the court has made its decision is equally essential. That record must include a recitation of the reasons that explain why some of the cases offered by the parties were persuasive and others were not, as well as the court's description of the cases over which it presided or about which it was aware that it found to be relevant comparisons. The court's own informed conscience is a fundamental part of the basis on which its decision rests, but the court must do more than gasp or express disbelief at a verdict's size. Rather, it is incumbent on a trial court to state those cases, experiences, or views that inform its conscience and that give content to its decision.

Third, the trial court may use its "feel of the case" to inform its reasoning about whether a particular verdict is so wide of the mark that remittitur is appropriate. We have recently observed that our deference to the trial court's " 'feel of the case' is not just an empty shibboleth [because] it is the trial judge who sees and hears the witnesses and the attorneys, and who has a first-hand opportunity to assess their believability and their effect on the jury." *Jastram, supra,* 197 *N.J.* at 230, 962 *A.*2d 503. Indeed, trial judges see much that juries do not. They see plaintiffs entering and leaving the courtroom each day, observe

them when the jury's attention is on another witness or exhibit, and are privy to their interactions and behaviors when the jury is absent from the courtroom during colloquy, conferences, and breaks during proceedings. It is those observations that give content to the trial court's "feel of the case" and that may lend legitimate support to its evaluation of a remittitur application.

Although trial judges therefore have a unique vantage point from which to assess independently some matters that bear on the quantum of an award, they must articulate those observations with care and precision. Only through creation of a sufficient record of the trial court's "feel of the case" can we ensure that the court has not substituted its view for those things that the jury was equally able to observe or that it has otherwise failed to defer to the jury's evaluative role.

Finally, appellate courts must be mindful of their proper role on review. Just as the trial court must give due deference to the jury's judgment and must explain in detail its reasons for concluding that an award requires remittitur, so too must the appellate panels recognize that their mere disagreement with that evaluation will not suffice. *See Johnson, supra,* 192 *N.J.* at 282, 927 *A.*2d 1269 (cautioning that "appellate court must pay deference to the trial court's 'feel of the case.'"). As we have explained, the standard that our appellate courts must utilize is "substantially similar to that used at the trial level, except that the appellate court must afford 'due deference' to the trial court's 'feel of the case,' with regard to the assessment of intangibles[.]" *Jastram, supra,* 197 *N.J.* at 230, 962 *A.*2d 503.

## B.

With these essential principles before us, we turn to a review of the record on which the trial court relied in support of its remittitur order. In this matter, the trial court relied on its personal experiences, its review of verdicts in other cases it believed were relevant comparisons, and its "feel of the case" observations. Taken together, those formed the basis for its

conclusion that the jury's awards for plaintiff's pain and suffering and for the co-plaintiff's loss of consortium were "shocking" to the judicial conscience.

The court's experience was extensive, covering twenty-two years of practice as a personal injury litigator, including experience as a Certified Civil Trial Attorney, much of which was concentrated in the vicinage in which this verdict was returned. Although having served on the trial bench for only a few months, that prior experience, which informed the court's sense of where the wide range of acceptable ended, is significant. To be sure, the court did not describe any specific jury awards from that prior experience as a trial lawyer, but its observation that it had never encountered a like amount gives content that the court's views would lack had the trial court never engaged in a personal injury practice.

Second, the trial court identified two trials over which the court had presided since being appointed to the bench. Although hardly identical to plaintiff's claims and circumstances, those matters were indeed relevant. One involved a plaintiff with similar injuries but more extensive treatment and the other involved a plaintiff with quite different injuries and far more extensive treatment, but who had similar disabling impacts on her ability to work. The significance of those matters, known to us only because the court identified them in some detail, springs from the greatly disparate award made by this jury in comparison.

Moreover, the trial court set forth, as best it could, the information that defendant had provided about verdicts in six other personal injury matters. That information, while far less complete, nonetheless helped to fix the framework of what the "wide range of acceptable" was for the court to consider. Those matters included verdicts returned in favor of plaintiffs whose injuries were severe enough to require surgery, who had multiple levels of disc herniations with varying degrees and kinds of treatment, and who had significant impacts on their work and their lives.

None was identical to plaintiff's injuries, treatment, or life circumstances. Nevertheless, those cases, as the court commented, fixed the highest known verdict returned in any case that was even remotely similar to plaintiff's claim at a small fraction of this jury's award. Using those cases as exemplary of the "wide range of acceptable," the trial court reasoned that this verdict fell well beyond that range, particularly when the highest verdict by comparison was returned in favor of a plaintiff with far more extensively treated injuries.

Third, the trial court expressed its reasons for concluding that its "feel of the case" supported its decision to grant remittitur. In doing so, the court made a number of observations about plaintiff, including her appearance, demeanor, and behavior as she came and went during the trial. Although the court did not specify that those observations were made entirely separate from times when the jury was in the courtroom, some of them, like the comments about plaintiff's manner of entering and exiting the courtroom, plainly were observations that the jury could not have made.

## C.

Utilizing all of the bases that the trial court set forth in this record, we conclude that its decision to direct a remittitur was appropriate and that the appellate panel's decision rejecting that order was in error. We reach that conclusion for several reasons.

First and foremost, the test for remittitur that the panel devised would demand that matters offered for comparison be so closely similar as to be identical, thus fixing a new standard that would be impossible to meet under any circumstances. In rejecting the trial court's comparisons as insufficiently reflective of plaintiff's unique life, *see He, supra,* 411 *N.J.Super.* at 30, 983 *A.*2d 1164, the appellate panel insisted on a level of exactitude contrary to the test this Court has previously adopted. *See Johnson, supra,* 192 *N.J.* at 281, 927 *A.*2d 1269 (commenting that when relying on other verdicts trial court "must give a factual analysis of how the award is different or similar to others to which it is compared");

*Jastram, supra,* 197 *N.J.* at 233–34, 962 *A.*2d 503 (commenting that it is appropriate to rely on other verdicts by analogy but noting that general references lacking descriptive content are insufficient); *Fertile, supra,* 169 *N.J.* at 500–01, 779 *A.*2d 1078 (approving court's reliance on its experience with other verdicts).

Second, in concluding that the matters relied upon by the trial court were insufficiently comparable to withstand its scrutiny, the appellate panel ignored the fact, particularly noteworthy to us, that plaintiff provided no verdicts of any kind for comparison. Neither in response to the initial motion for new trial or remittitur, nor during the lengthy appellate process, nor even after this Court remanded the matter, did plaintiff make an effort to supplement the record with verdicts that might suggest that the award was not appropriate for remittitur. Instead, the only record before this Court demonstrates that the trial court appropriately concluded that this verdict, which was many multiples of the verdict in favor of even the most seriously injured comparative plaintiff, was so "wide of the mark" that it amounted to one that is "shocking" to the judicial conscience.

Third, in addressing the trial court's references to its own experiences both before and after being appointed to the bench, the panel adopted an approach to such experiences that was unduly restrictive. Essentially demanding that the trial court be limited to relying only on nearly identical experiences, the appellate panel stripped the trial courts of any mechanism through which to explain what it is that has informed the judicial conscience and compelled, in the trial courts' estimation, the grant of remittitur.

Fourth, by criticizing the trial court for finding only the non-economic damage awards, and not the economic awards, to be shocking, the panel failed to appreciate the different roles played by those separate categories of damages and the different proofs relevant to each. The jury heard evidence that plaintiff had sustained annual past lost wages that totaled $110,194.55 for a time period of four and one-half years. The jury also heard that

plaintiff's expected future work life would have been twenty years and awarded her approximately twenty times her average yearly income to compensate her. That the jury awarded plaintiff all of her past lost wages and apparently utilized that annual sum to extrapolate into the future simply tells us that they agreed that she is unable to work. Those awards tell us nothing, however, about plaintiff's pain and suffering or loss of the enjoyment of life. That is, although many things could have factored into the jury's decision that plaintiff would not be able to return to work, including her limited English language proficiency, her limited education, and lack of job skills, those same considerations do not necessarily bear on plaintiff's pain and suffering, or, for that matter, her husband's loss of consortium. Because there is no necessary correlation between a sizeable lost wage award and non-economic damages, the appellate panel's criticism of the trial court for remitting one category of awards but not the other is unpersuasive.

Finally, by disregarding, rather than evaluating, the trial court's explanation of the basis on which it decided that its "feel of the case" bore on the propriety of the damage award, the appellate court overlooked the vantage point that the trial court enjoyed separate and apart from that of the jury.

There can never be two plaintiffs whose injuries, medical treatment, and life circumstances so perfectly align that they can be exact comparisons. But our law does not require exactitude; it requires instead an understanding of where the edges of the wide range of acceptable are found and a careful articulation of why and how a particular verdict has so exceeded those bounds that it cannot stand. Although remittitur is, and must be, reserved for those truly unusual cases in which an award is shocking, and although it demands that the trial court fix the remittitur at the "highest figure that could be supported by the evidence," *Fertile, supra,* 169 *N.J.* at 500, 779 *A.*2d 1078, we find in our review of this record ample support for the trial court's order.

## V.

The judgment of the Appellate Division is reversed and the matter is remanded to the trial court for further proceedings consistent with this opinion.

Justice ALBIN, dissenting.

The jury awarded plaintiff Ming Yu He $1,000,000 in pain-and-suffering damages for permanent and disabling injuries caused in a motor-vehicle collision and awarded her husband $100,000 on his loss-of-consortium claim.[1] The three-person majority now reverses the unanimous ruling of the Appellate Division upholding those awards and reinstates the trial judge's remittitur reducing them by eighty percent. As a result, Mrs. He and her husband will receive only a fraction of the damages awarded to them by the jury.[2]

I dissent because the majority, like the trial judge, has not paid proper deference to the judgment of the jury, which assessed the quantum of plaintiff's pain and suffering and her husband's loss of consortium after observing and hearing all the witnesses. Instead, the majority has substituted itself as the decisive juror, thus diminishing the right to a civil jury trial and breaking with the deferential principles of our remittitur jurisprudence.

I dissent because although the majority and trial judge pay lip service to the deferential standard of review governing remittitur, they do not "accept the evidence in the light most favorable to the plaintiff" in determining whether the damages award shocked the judicial conscience. See *Johnson v. Scaccetti*, 192 *N.J.* 256, 281, 927 *A.*2d 1269 (2007). Additionally, instead of reviewing the record de novo to determine the propriety of the remittitur—the

---

[1] The jury also awarded Mrs. He $110,000 in past lost wages and $500,000 in future lost wages. Those awards are not at issue.

[2] That is if Mrs. He and her husband accept the remittitur. They are permitted to reject the remittitur and request a new trial on damages. See *Johnson v. Scaccetti*, 192 *N.J.* 256, 280–81, 927 *A.*2d 1269 (2007).

correct standard of review—the majority first views the damages award through the subjective lens of the trial judge and then finds no abuse of discretion.

I dissent because the majority has transformed the shock-the-judicial-conscience standard—formerly an objective test to be applied de novo by this Court—into a subjective test, allowing a trial judge to overthrow a jury's verdict based on the judge's personal experiences as a trial attorney. Moreover, the majority defers to the judge's comparisons to other cases that either were not sufficiently similar to the present case or were inadequately detailed on the record to allow for a fair comparison. Not only did the trial judge fail to articulate sound reasons—based on evidence in the record—for reducing Mrs. He's award to $200,000, but both he and the majority have given *no* reason for reducing Mr. He's award to $20,000.

I dissent because, under the banner of the judge's "feel of the case," the majority has allowed the judge's courtroom observations of Mrs. He, in assessing the degree of her pain and suffering, to trump those of the jury whose ring-side seat placed it in a position to render its own judgment. Because the conclusions the judge drew from his observations are directly contradicted by evidence that the jury believed, the majority should defer to the trier of fact—the jury—not the judge.

Last, I dissent because the majority does not give sufficient weight to the presumption of validity of a jury verdict. The undeniable reality is that no two juries likely will award the exact same damages for pain and suffering, and therefore we must acknowledge that reasonable people may differ about any specific award falling within a wide range of acceptable outcomes. Within that acceptable range, even a seemingly high award should not be second-guessed by a court. So long as a rational jury could have arrived at the award—an award not so wide of the mark that it shocks the judicial conscience—it must not be disturbed. Here, the jury's award was rationally based on the evidence and fell within the acceptable range for pain-and-suffering damages.

I now will detail how the majority has erred in depriving Mrs. He and her husband of the awards they rightfully received by a jury. Because today's majority opinion cannot be reconciled with this Court's remittitur jurisprudence, I first review the law of remittitur.

## I.

### An Overview of Remittitur Jurisprudence

A rational system of justice requires a judicial role in reviewing jury verdicts; nevertheless, "the authority to set aside damages awards on grounds of excessiveness is limited." *Jastram v. Kruse*, 197 *N.J.* 216, 228, 962 *A.2d* 503 (2008) (internal quotation marks and citations omitted). The authors of our constitutional charters placed in the hands of the jury—not a judge—the power to decide civil disputes, great and small. *See N.J. Const.* art. I, ¶ 9 ("The right of trial by jury shall remain inviolate."); *U.S. Const.* amend. VII ("In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved...."). "[A] civil plaintiff has a constitutional right to have a jury decide the merits and worth of her case." *Johnson, supra*, 192 *N.J.* at 279, 927 *A.2d* 1269 (citation omitted). Underlying that constitutional right is a profound faith in the ability of "ordinary men and women of varying experiences and backgrounds, who serve as jurors," to render a fair verdict and, if the plaintiff prevails, to award reasonable damages. *See ibid.*

Therefore, a jury's verdict in a civil case, including an award of damages, is entitled to great deference by a reviewing court. In determining just compensation for an accident victim, a jury must be given wide latitude. *See Baxter v. Fairmont Food Co.*, 74 *N.J.* 588, 598–99, 379 *A.2d* 225 (1977). That is particularly so in rendering an award of damages for pain and suffering because "there is no neat formula for translating pain and suffering into monetary compensation." *Johnson, supra*, 192 *N.J.* at 280, 927 *A.2d* 1269. The quantification of pain-and-suffering damages is "not susceptible to scientific precision" and "necessarily requires a

high degree of discretion." *Id.* at 279–80, 927 *A.2d* 1269. Indeed, the language of the Civil Model Jury Charge governing the determination of pain-and-suffering damages reflects the broad discretion vested in the jury. *See Model Jury Charges (Civil), Damages Charges–General: Disability, Impairment and Loss of the Enjoyment of Life, Pain and Suffering* § 8.11E (Dec.1996).

"Although the measure of damages is what a reasonable person would consider to be adequate and just under all the circumstances, reasonable people [will] differ on what is fair compensation in any particular case." *Johnson, supra,* 192 *N.J.* at 280, 927 *A.2d* 1269 (citation and internal quotation marks omitted). It should be clear that even different juries hearing the same evidence might well return different awards of damages, all falling within a wide but reasonable range.

Judicial deference to a jury award of damages must be informed by the broad contours that define a just award of damages for pain and suffering. There is a broad acceptable range into which any particular award may fall. That is so even if the award is "high, [and] perhaps overly generous." *See id.* at 283, 927 *A.2d* 1269; *Jastram, supra,* 197 *N.J.* at 235, 962 *A.2d* 503 ("To be sure ... this was a high verdict, but that does not mean it was excessive."). So long as a damages award is "within the range of permissible jury decision[s]," *Baxter, supra,* 74 *N.J.* at 604, 379 *A.2d* 225—that is, a rational jury could have returned such an award, *Jastram, supra,* 197 *N.J.* at 235, 962 *A.2d* 503—then the award must not be disturbed. Thus, a "judge may not substitute his judgment for that of the jury merely because he would have reached the opposite conclusion." *Baxter, supra,* 74 *N.J.* at 598, 379 *A.2d* 225 (quoting *Dolson v. Anastasia,* 55 *N.J.* 2, 6, 258 *A.2d* 706 (1969)).

"[T]he presumption of correctness of a verdict by a jury" is informed by "centuries of common law merged into our constitutional framework." *Ibid.* That presumption can only be overcome in cases where, "having given due regard to the opportunity of the jury to pass upon the credibility of the witnesses, it clearly and

convincingly appears that there was a miscarriage of justice." *See R.* 4:49–1(a). We have articulated this standard in varying ways, all with the aim of ensuring that a verdict or damages award will be vacated only in exceptional circumstances. Accordingly, a trial judge should not order a new trial or remit a jury's damages award unless it is so clearly disproportionate to a plaintiff's pain and suffering and loss of enjoyment of life "that it may be said to shock the judicial conscience," or to be "wide of the mark and pervaded by a sense of wrongness." *Johnson, supra,* 192 *N.J.* at 281, 927 *A.*2d 1269 (internal quotation marks and citation omitted).

Judicial deference also requires that, in deciding whether to grant a remittitur, the court view the evidence in the light most favorable to the plaintiff. *Ibid.* So long as the evidence viewed in that light supports a damages award that could have been reached by a rational jury, a court is obliged to respect the jury's judgment. *Jastram, supra,* 197 *N.J.* at 231, 235, 962 *A.*2d 503 (reversing Appellate Division, which remitted damages award, because it viewed evidence in light negative to plaintiff).

## II.

### The Evidence Viewed in the Light Most Favorable to Plaintiffs

The majority erred by not adhering to the basic principle of remittitur jurisprudence that a jury's damages award is evaluated by viewing "the evidence in the light most favorable to the plaintiff." *See Johnson, supra,* 192 *N.J.* at 281, 927 *A.*2d 1269. In that favorable light, Mrs. He appears in 2003 as a healthy and happily married woman, rearing two children and caring for her immigrant Chinese parents while gainfully employed as a housekeeper at a New York hotel. That year, at the age of forty-two, she was operating her car on a roadway when a vehicle traveling in the opposite direction driven by defendant Enilma Miller crossed over a double-yellow line, causing a head-on collision. Mrs. He was knocked unconscious and awoke in severe pain in her wrecked car. She suffered five herniated discs in her neck and back, which were compressing nerves and causing diminished

strength and motion in her arms. Perhaps even more significantly, the herniated discs have left her in a permanent and chronic condition of pain. She endured a series of failed treatments, including cortisone injections to her spinal area that caused her to sweat profusely and her leg to swell.

She can no longer work, maintain her home, shop, care for her parents, have intimate relations with her husband, engage in routine activities with her children (such as ride a bicycle), or do other everyday tasks that were essential to her role as a mother and wife. All the while pain is her constant companion and will be for the rest of her life.[3] The limitations placed on Mrs. He, including the inability to care for her aged parents, have made her feel "useless" as a human being.

The case of Mr. He reveals a husband who has lost the consortium of his wife, the primary caretaker of his home and his children, his sexual partner, and the woman with whom he enjoyed the most basic of life's activities. He has had to curtail extended work-related trips in order to tend to his wife and handle domestic duties that were previously plaintiff's responsibility.

The trial judge's stated reasons for remitting Mrs. He's pain-and-suffering award to $200,000 and her husband's loss-of-consortium award to $20,000 clearly show that he did not view *all* the evidence in the light most favorable to plaintiffs. Instead, he concentrated on weaknesses he perceived in Mrs. He's case, an approach not consistent with a deferential standard of review. *See Jastram, supra,* 197 *N.J.* at 231, 962 *A.*2d 503. The judge considered it noteworthy that the "medical evidence demonstrated that surgery was not recommended by [Mrs. He's] treating doctors." That recommendation, however, had nothing to do with the seriousness of Mrs. He's condition. The doctors concluded that

---

[3] Plaintiff's life expectancy was 37.4 years from the date of her accident when she was 42 years old. Life Expectancy Table, Pressler & Verniero, *Current N.J. Court Rules,* Appendix I at 2399 (2011).

she was not a good candidate for surgery, fearing that "a failed surgery" could mean a "lifetime [on] narcotic pain medication."

Moreover, rather than focusing on plaintiffs' expert's ultimate conclusion that the disc herniations were the proximate cause of Mrs. He's weakened condition and permanent suffering, the trial judge gave emphasis to her pre-existing degenerative disc disease. Also, instead of highlighting the extent and severity of Mrs. He's injuries, the trial judge highlighted some mundane things she could still do: care for herself, perform light cleaning, and drive a car. Yet, the judge did not explain the limitations attached to those activities: Mrs. He can microwave a "single dish" for herself, but not cook for her family; she can do light dusting, but not clean her home; she can drive, but only for short distances.

All in all, the trial judge did not view the evidence in the light most favorable to plaintiffs as required under our remittitur jurisprudence.

## III.

*The Trial Judge's "Feel of the Case" Is Not a Substitute for the Jury's Factual Findings or This Court's De Novo Review of the Record*

An appellate court reviewing a remittitur engages in a de novo review of the record, applying the same standards governing the trial court and paying no special deference to the trial judge's findings except for those that touch on his or her "feel of the case." *Johnson, supra,* 192 *N.J.* at 282, 927 *A.*2d 1269; *Baxter, supra,* 74 *N.J.* at 596, 379 *A.*2d 225. Even then, some caution is required because ultimately it is the jury's "feel of the case" that controls the outcome of every case.

A judge's "feel of the case" should not be the basis for over-throwing a jury's credibility determinations and findings of fact. The trial judge placed importance on his observations that "[Mrs. He's] gait and appearance did not appear to be in any way affected by her injuries" and that "there were not outward signs

of pain and discomfort observable during the course of trial."
However, had the judge applied the most-favorable-evidence stan-
dard, he would have recognized that, at trial, Mrs. He was taking
a powerful, narcotic pain medication. That evidence alone should
have provided a sufficient explanation for the judge's failure to
discern "outward signs of pain" in the courtroom. Moreover, the
jury had a clear view of Mrs. He through days of trial. As we
noted in *Baxter,* the judge's "feel of the case" based on courtroom
observations of a plaintiff is entitled to minimal weight when the
jury has had an "equal opportunity" to observe the plaintiff. 74
*N.J.* at 600–01, 379 *A.*2d 225. As in *Baxter,* there is no basis to
conclude that Mrs. He was malingering or has exaggerated her
suffering. *See ibid.*

Certainly, a judge's "feel of the case" is entitled to some weight.
But when the judge's observations are directly contradicted by
evidence that the jury apparently believed, an appellate court
should not reflexively defer to the invocation of "the feel of the
case," as the majority did here. *See, e.g., Johnson, supra,* 192
*N.J.* at 283, 927 *A.*2d 1269 (finding that trial court's indication that
plaintiff showed no signs of pain during trial was contradicted by
its finding that her life outside of court was one of "constant
pain").

Today, the majority exalts the trial judge's "feel of the case"
above the jury's duty to decide for itself the quantum of damages
in a civil case and, at the same time, undermines this Court's
obligation to review remittitur motions de novo—that is, based on
the objective evidence of record. *See ante* at 254–56, 24 *A.*3d at
265–66.

## IV.

### *The Trial Judge's Subjective, Personal Experiences Are Not Germane to the Shock–the–Conscience Standard*

When a reviewing court considers whether a particular damages
award shocks the judicial conscience, the test—however difficult to

apply—must be an objective one. The shock-the-conscience standard does not depend on the unique personal experiences of the particular judge who is presiding over the case. This is a point Chief Justice Hughes made clear in *Baxter*:

> [A]ll judges, whether trial or appellate, are human and ... the judgment of each is inevitably affected by subjective prejudices or predispositions relating to properties or specific tendencies of the individual mind, as distinguished from general or universal experience. These natural subjective inclinations derive from the particular background or experience of the individual judge, whether from tenure on the bench in examining or recalling other cases, from previous activity in law practice in diverse fields or, for that matter, from any human experience, such as a youthful background of poverty or wealth or the like. Such individuality of approach extends of course to the field of admeasuring damages flowing from injuries caused by negligence, as in the present case, or other wrong. It is for the merging of such individualized propensities of mind into an amalgam of common judicial experience related to the doing of justice that judges are admonished to resist the natural temptation to substitute their judgment for that of the jury.
>
> [74 *N.J.* at 596–97, 379 *A.*2d 225.]

Thus, however much trial and appellate judges are affected by their subjective prejudices and predispositions and life experiences, those "individualized propensities of mind" must somehow be merged into "an amalgam of common judicial experience related to the doing of justice." *Ibid.* To be sure, this is not an easy undertaking, but "judges are admonished to resist the natural temptation to substitute their judgment for that of the jury." *Ibid.* (citation omitted).

A judge's unspecified personal experiences—even as a certified civil trial attorney—cannot serve as the basis for a remittitur. Yet the majority endorses just this approach in contravention of *Baxter.* The majority holds that the trial judge's experiences as a personal-injury litigator in the Morris County region properly informed his decision to grant a remittitur. If that is the new governing standard, then the members of this Court, who review de novo the propriety of the remittitur, would be able to substitute their own personal experiences in private practice and on the bench in determining whether the damages award shocks their *personal* judicial consciences. The majority states that "no two judges are identical." *Ante* at 253, 24 *A.*3d at 264. The implica-

tion is that the grant or denial of a remittitur may depend on the sheer happenstance of whom a litigant draws as a trial or appellate judge.

It is not the judge's personal conscience but the judicial conscience that matters. Thus only when the damages award "is so clearly disproportionate to the injury," so "wide of the mark," so "pervaded by a sense of wrongness," that it "shock[s] the *judicial* conscience," should a judge overturn a jury's damages award. *See Johnson, supra,* 192 *N.J.* at 281, 927 *A.*2d 1269 (emphasis added) (internal quotations and citations omitted).

To turn the outcome of a remittitur motion on the unspecified and unarticulated personal experiences of a judge will truly give the appearance that the judge is the final "and decisive juror." *See Dolson, supra,* 55 *N.J.* at 6, 258 *A.*2d 706. Moreover, if the court intends to rely on evidence outside of that record, a party has a fundamental right to notice and an opportunity to be heard, including an opportunity to object and present contrary evidence. *See First Resolution Inv. Corp. v. Seker,* 171 *N.J.* 502, 514, 795 *A.*2d 868 (2002) ("[D]ue process [requires] notice and an opportunity to be heard." (citation and internal quotation marks omitted)).

## V.

*Comparisons to Dissimilar Cases Should Not Be the Basis for Overturning a Jury's Award*

A court granting a remittitur "must articulate its reasons for reducing a damages award by reference to the trial record." *Johnson, supra,* 192 *N.J.* at 281, 927 *A.*2d 1269. We have held that "[a]lthough the court may rely on its knowledge of other injury verdicts, if it does so, it must give a factual analysis of how the award is different or similar to others to which it is compared." *Ibid.* (internal citation omitted); *see Jastram, supra,* 197 *N.J.* at 233–34, 962 *A.*2d 503 (same).

The trial judge's inapt comparisons to other cases were not the "complete and searching analysis" we had in mind when we

remanded for "a factual analysis of how [plaintiff's] award is different or similar to others to which it is compared." *See He v. Miller,* 199 *N.J.* 538, 539, 973 *A.*2d 943 (2009) (quotation omitted); *see also Jastram, supra,* 197 *N.J.* at 234, 962 *A.*2d 503 (rejecting cursory comparison of plaintiff's case to "thousands of garden-variety lumbar strains and sprains that pass through our courts every year" (quotation omitted)).

The trial judge began by comparing the present case to two personal-injury cases tried to a jury over which he presided just two months after he came onto the bench. In one, *Morales v. Keith,* the plaintiff, a thirty-four-year-old male, was involved in an automobile accident and later diagnosed with disc herniations and carpal-tunnel syndrome for which he received treatment, including carpal-tunnel surgery. According to the plaintiff's testimony, his lifestyle was "affected"; he experienced "pain and discomfort in his neck and back"; he could not work as many hours as he had before the accident; he could not sit or drive for extended periods of time; and his recreational activities were curtailed. The jury awarded the plaintiff only $2,500. Nevertheless, the parties consented to an additional $46,022 in damages.

In this case, the Appellate Division suggested that the $2,500 award in *Morales* "might be more likely to suggest the verdict was shockingly low, as revealed by the parties' stipulation that increased the award to nearly $50,000." *He v. Miller,* 411 *N.J.Super.* 15, 29, 983 *A.*2d 1164 (App.Div.2009). The generalized description of the impact of the injuries on the plaintiff in *Morales* do not compare to the detailed testimony in the present case describing how this plaintiff's injuries have utterly destroyed the life she had known, taking from her not only her enjoyment of life but also her sense of self-worth. Importantly, no one can tell whether the jury credited the testimony of the plaintiff in *Morales.* The low verdict there may well have reflected the jury's disbelief of that plaintiff's account of the nature and extent of his injuries. Here, the seemingly high verdict may be nothing more than the jury's full acceptance of Mrs. He's and her family's

description of the devastating impact of her injuries on her unique life. *See Ostrowski v. Azzara*, 111 *N.J.* 429, 438, 545 A.2d 148 (1988) ("[a] defendant must take [his] plaintiff as he finds [her]") (internal quotation marks and citation omitted).

The second comparable case over which the trial judge presided, *Ziza v. Romanelli*, involved a fifty-five-year-old female who "sustained a hairline fracture of her ankle and torn ligaments" from a fall-down accident. That plaintiff underwent surgery for the reconstruction of ankle ligaments, received cortisone shots and physical therapy, and had a spinal-cord stimulator implanted to relieve her pain. Her lifestyle and marital relationship were "affected" by the injuries and she was unable to continue to work in the family bakery business. The plaintiff received "a gross award of $200,000 and her husband $25,000" on his loss-of-consortium claim.

The first apparent difference between the two cases is that in *Ziza* the plaintiff suffered a serious ankle injury and in this case Mrs. He suffered a serious spinal injury. Also the plaintiff in *Ziza* was thirteen years older than Mrs. He at the time they suffered their respective injuries. Unlike the case of Mrs. He, there is no indication that the plaintiff in *Ziza* was rendered totally unemployable as a result of her ankle injury. Although the trial judge relates that the lifestyle and marital relationship of the plaintiff in *Ziza* were "affected," we do not know how or to what degree. On the other hand, we do know that forty-two-year-old Mrs. He could no longer have sexual relations with her husband as a result of her injuries and suffered a regime of constant, debilitating pain. Based on the paucity of information provided by the trial judge, it is impossible to tell whether the *Ziza* award falls inside a spectrum of possible reasonable awards, and, if so, whether it is at the low or high end of that spectrum. Whatever similarities can be drawn between the two cases, there are a multitude of differences and too little is known about the *Ziza* case.

Moreover, the trial judge here made a superficial comparative analysis to six other cases over which he did not preside. All six

cases involved plaintiffs who suffered disc herniations, and the range of awards spanned from $40,000 to $200,000. The judge was "provided with limited factual details" about those cases by defendant. From those cases, we can glean the general nature of the injuries, but know nothing about the impact of those injuries on the lives of those plaintiffs—whether the plaintiffs were rendered unemployable, whether they would have to endure a lifetime of pain and suffering, the restrictions on their lives, the degree of loss of enjoyment of life, and much more. The lack of adequate data about those six cases negates any meaningful comparison to the case of Mrs. He and her husband.

After approving those strained comparisons, the majority faults Mrs. He for not having offered any comparable cases of her own. *See ante* at 257, 24 *A.*3d at 267. Because a jury verdict is presumed to be correct, Mrs. He was under no obligation to cite to any cases to justify the award returned by a jury that had heard her case. Requiring a plaintiff to offer comparable awards undermines the very "presumption of correctness" that had formerly applied to a jury verdict. *See Baxter, supra,* 74 *N.J.* at 598, 379 *A.*2d 225.

Last, the trial judge did not allude to any personal experience or comparable case to explain the remittitur of Mr. He's loss-of-consortium damages award. The majority provides no explanation either.

## VI.

### *The Jury Award Does Not Shock the Judicial Conscience*

The high bar that insulates damages awards from routine judicial second-guessing—the manifest-miscarriage-of-justice standard—does not require a comparative-damages-award approach. It should be remembered that cases calling for a new trial or a remittitur or additur should starkly stand out based on the evidence of record.

A grossly excessive or grossly inadequate damages award will be obvious in many cases; that is, it will shock the judicial conscience. In such a case, after a judge canvasses the record, viewing the evidence in the light most favorable to the plaintiff, it should be clear that the "verdict is terribly wrong." *Baxter, supra,* 74 *N.J.* at 598, 379 *A.*2d 225. The "pervading sense of 'wrongness' needed to justify" overthrowing a jury verdict may be "difficult to define, because it involves the reaction of trained judges in the light of their judicial and human experience," but it requires that a judge possess a "definite conviction" that the jury "went so wide of the mark" that the award shocks the judicial conscience. *Id.* at 599, 379 *A.*2d 225 (internal quotation omitted).

Recently, we had occasion to vacate a jury's damages award based on our de novo review of the record. In *Besler v. Board of Education of West Windsor–Plainsboro Regional School District,* 201 *N.J.* 544, 573–75, 993 *A.*2d 805 (2010), the plaintiff was gaveled down at a board of education meeting and not permitted to complete a statement critical of the board and school officials. We upheld the jury's verdict that the board violated the plaintiff's First Amendment rights. *Id.* at 555, 993 *A.*2d 805. But the only support for the jury's $100,000 pain-and-suffering award was testimony that the plaintiff "was 'completely embarrassed,' 'shocked,' 'bewildered,' 'sick to [his] stomach,' and felt like a leper." *Id.* at 578, 993 *A.*2d 805 (alteration in original). The plaintiff did "not claim that the incident caused nightmares or sleeplessness, or impaired his reputation, his relations with others, or his ability to function," and therefore the $100,000 damages award was based, "at best, [on] transient emotional distress." *Ibid.* We concluded that the damages award was "so clearly excessive that it constitute[d] 'a miscarriage of justice,'" and remanded to the trial court to conduct a remittitur hearing. *Id.* at 580–81, 993 *A.*2d 805. The *Besler* award was not a close call where "the tie must go to the jury." *See Johnson, supra,* 192 *N.J.* at 283, 927 *A.*2d 1269.

On the other hand, we have upheld pain-and-suffering damages awards, even when high, which could have been reached by a rational jury and which were not so wide of the mark that they constituted a manifest miscarriage of justice. *See, e.g., Jastram, supra,* 197 *N.J.* at 220, 234–35, 962 *A.*2d 503 (upholding $500,000 pain-and-suffering award); *Johnson, supra,* 192 *N.J.* at 261, 283–84, 927 *A.*2d 1269 (upholding $2,500,000 pain-and-suffering award and $500,000 loss-of-consortium award).

The jury's awards of $1,000,000 in pain-and-suffering damages to Mrs. He and $100,000 for loss of consortium to her husband—however seemingly high—fall within a permissible range. The awards are grounded in the evidence and could have been reached by a rational jury. The majority did not independently determine for itself—de novo—whether the damages awards were manifestly excessive, that is, shocked the judicial conscience. Instead, turning the standard of review on its head, the majority determines that there was in "this record ample support for the trial court's order." *See ante* at 259, 24 *A.*3d at 268; *see also ante* at 255, 24 *A.*3d at 265 ("appellate panels [must] recognize that their mere disagreement with [trial court's] evaluation will not suffice"). Again, it must be noted that neither the trial judge nor the majority have given any explanation for the reduction of Mr. He's loss-of-consortium award.

## VII.

### *Conclusion*

A review of the evidence in the light most favorable to plaintiffs shows that the damages awards were not grossly excessive, not pervaded by such a sense of wrongness that they shock the judicial conscience. The awards do not constitute a manifest miscarriage of justice necessitating a new trial or a remittitur. I would affirm the Appellate Division, which overturned the trial judge's remittitur and reinstated the damages awarded by the jury. I therefore respectfully dissent.

*For reversal and remandment*—Justices RIVERA–SOTO, HOENS and WEFING—3.

*For affirmance*—Chief Justice RABNER and Justice ALBIN—2.

*Not Participating*—Justices LONG and LaVECCHIA—2.