NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0326-13T3

JESSE L. MICKENS, JR.,

      Plaintiff-Respondent,

  v.

TIMOTHY S. MISDOM and CITY OF
ELIZABETH,

      Defendants-Appellants.

> **APPROVED FOR PUBLICATION**
>
> **January 7, 2015**
>
> **APPELLATE DIVISION**

_____

Submitted November 5, 2014 — Decided January 7, 2015

Before Judges Fisher, Nugent and Accurso.

On appeal from the Superior Court of New Jersey, Law Division, Union County, Docket No. L-4050-10.

LaCorte, Bundy, Varady & Kinsella, attorneys for appellants (Richard M. Brockway, of counsel and on the brief).

Michael A. Percario, LLC, attorneys for respondent (Christopher F. Struben, on the brief).

The opinion of the court was delivered by

FISHER, P.J.A.D.

Plaintiff Jesse L. Mickens, Jr., was injured on January 8, 2010, when his automobile was struck by a pick-up truck owned by

defendant City of Elizabeth and operated by defendant Timothy Misdom. The parties stipulated defendants' liability and, at the trial's conclusion, the jury found a permanent injury, as necessitated by N.J.S.A. 59:9-2(d), and awarded plaintiff $2,400,000 in damages for his disability, impairment, loss of enjoyment of life, and pain and suffering. The trial judge later denied defendants' motion for a new trial or remittitur, and defendants now appeal, arguing, among other things, the award was so grossly excessive as to demonstrate a miscarriage of justice. In deferring to the jury's assessment of the evidence and the trial judge's "feel of the case," we affirm the judge's determination that, although high, the verdict was not shocking to "the judicial conscience," let alone the judge's own conscience derived from his experiences as a trial judge and practicing attorney.

I

In examining the issues presented, we first briefly consider the evidence regarding the nature of the accident, plaintiff's injuries, and their impact on his life.

The jury heard that plaintiff was forty years of age when the accident occurred. Plaintiff was sitting in his parked vehicle when, as he "leaned over as though to retrieve something from the floor of the front passenger seat," he felt an impact

caused by defendants' pick-up truck, which had backed into and moved plaintiff's vehicle ten to fifteen feet from its former stopped position. The trial judge noted in his thorough written decision, which memorialized the denial of defendants' new trial motion, that photographs admitted in evidence did not reveal "severe damage" to either plaintiff's vehicle or defendants' truck, although the photographs depicted "visible damage to [plaintiff's] vehicle['s] rear end." When the police arrived, plaintiff declined medical attention but later went to an emergency room because of lower back pain. He was released the same day.

Plaintiff consulted with a chiropractor a few days later. Treatment provided no relief, and the chiropractor ordered an MRI study, which was conducted on March 1, 2010, and which revealed a herniated disc at L4-5. Plaintiff consulted a physician for pain management, and a neurosurgeon soon recommended disc-removal surgery, which was performed on August 5, 2010. According to the trial judge's written decision, plaintiff testified "that the surgery helped somewhat," but "he lives with persistent back pain and discomfort[.]" Plaintiff also testified that: he is employed as "a warehouse worker which [] involve[s] lifting and moving boxes around"; he missed four weeks of work, but returned to work because he could not afford

to miss any additional time; at the end of each work day "his back bothers him significantly, and he cannot do the things he used to do around the house or the things he did recreationally"; and he "can do very little except rest on evenings and weekends so he can try to keep working to support" his wife and child. By the time of trial, three years had elapsed from the date of the surgery with no change in plaintiff's daily pain, discomfort and limitations.

Plaintiff's wife, chiropractor and neurosurgeon also testified, the latter opining that accidents causing even "minor physical damage," as suggested by the photographs of plaintiff's vehicle, are not necessarily indicative of the extent of an occupant's injuries; he concluded that plaintiff sustained a permanent injury as a result of the collision. As described by the trial judge, the neurosurgeon testified that "immediately following the impact the herniated disc may not have been full blown at that time, but [] the impact caused the physical injury that evolved to the complete herniation depicted on the MRI less than 60 days post impact."

Defendants called a biomechanical engineer who testified that the herniated disc did not result from the collision, which

4
A-0326-13T3

he viewed as minor.[1]  The engineer was not a physician and lacked the expertise to make a medical diagnosis.  Moreover, as the trial judge noted, the engineer "conceded on cross-examination that studies he relied upon to support his opinion [about the impact] did not involve individuals who were stretched over to the side as [plaintiff] was in this collision," and the engineer conceded "different body types will respond differently to trauma."

In addition, defendants elicited testimony from an orthopedic surgeon, who recognized plaintiff had a herniated disc and sustained a permanent injury.  This expert also testified that the surgery was necessary and plaintiff will have problems with which he will have to live.  Although the expert testified it was "unlikely" the herniated disc resulted from the collision in question, he could not otherwise account for how it occurred and acknowledged plaintiff had no history of prior back injuries.

---

[1] The engineer relied in part on his belief that plaintiff's vehicle was in neutral at the time of impact — a fact in dispute, since plaintiff testified the vehicle was in gear when the collision occurred.  Because the jury undoubtedly found plaintiff credible, as did the trial judge, we will assume the jury also decided this factual question in plaintiff's favor.

A-0326-13T3

II

In appealing the $2,400,000 judgment entered in plaintiff's favor and the order denying their motion for a new trial or remittitur, defendants argue:

> I. THE TRIAL COURT'S INSTRUCTION TO THE JURY ON THE AWARD OF DAMAGES FOR PRE-EXISTING CONDITION CONSTITUTED REVERSIBLE ERROR.
>
> II. THE JURY VERDICT AWARDING [PLAINTIFF] $2.4 MILLION DOLLARS IS SO GROSSLY EXCESSIVE AS TO DEMONSTRATE PREJUDICE[,] PARTIALITY OR PASSION AND CONSTITUTES A MISCARRIAGE OF JUSTICE.
>
> III. THE JURY'S DETERMINATION THAT [PLAIN-TIFF] SUSTAINED SUBSTANTIAL PERMANENT INJURY WAS AGAINST THE WEIGHT OF THE EVIDENCE.

We find insufficient merit in Points I and III to warrant further discussion in a written opinion. R. 2:11-3(e)(1)(E).[2] We also reject Point II for the reasons that follow.

---

[2]We agree with the trial judge's comments in denying the post-trial motion as to Point I. The pre-existing-condition jury instruction was necessary because defense counsel had argued the possibility that plaintiff had a pre-existing condition in his opening statement and then cross-examined plaintiff about his days of playing cornerback for Rahway High School as well as his employment history, which included lifting heavy items in a warehouse. We affirm on this point substantially for the reasons set forth by the trial judge in his written opinion. We also reject defendant's Point III not only because the argument that the verdict was against the weight of the evidence was not urged in the post-trial motion and thus not cognizable on appeal, see R. 2:10-1, but also because there was more than
(continued)

A-0326-13T3

III

A

The legal principles that guide consideration of the quantum of a jury award were recently thoroughly examined by our Supreme Court. Although these principles are easily restated, their application — as the Court observed in He v. Miller, 207 N.J. 230, 235 (2011) — presents "profound difficulties that our trial courts and appellate tribunals continue to encounter as they seek to understand and apply the concepts surrounding remittitur." The matter at hand presents an interesting counterpoint to the result ultimately[3] reached in He v. Miller.

(continued)
sufficient evidence from which the jury could have found the collision caused a substantial permanent injury.

[3] Of course, there has yet to be an "ultimate" conclusion in He v. Miller. A jury previously returned a verdict of $1,000,000 for the plaintiff's pain and suffering, but the trial judge determined that any award beyond $200,000 would be excessive and ordered a remittitur to that amount which, if rejected by the plaintiff and her husband, whose per quod claim was also reduced, would result in a new trial. We reversed and reinstated the jury verdict, 411 N.J. Super. 15 (App. Div. 2009), but a closely-divided Supreme Court reversed, concluding we "misappli[ed] . . . settled precedents." 207 N.J. at 236. Thereafter, the plaintiffs rejected the remittitur, and the matter was again tried. This time the jury awarded $500,000 in pain and suffering -- far above what the earlier trial judge had found to be the outermost limit -- and a different trial judge with more than thirty years' experience on the bench rejected the argument that this verdict was excessive, stating, "I wasn't the least bit shocked by the verdict, not in the least"; we affirmed. He v. Miller, No. A-1599-12 (App. Div. Sept. 2, 2014)
(continued)

We first turn to the legal principles outlined in He v. Miller:

> The power of remittitur is not to be exercised lightly . . . because we repose enormous faith in the ability of juries to equate damages with dollars to "make the plaintiff whole, so far as money can do." We rely on juries to perform that task while recognizing that "[a]ssigning a monetary value to pain-and-suffering compensation is difficult because that kind of harm is 'not gauged by any established graduated scale.'" But a jury's authority is not unbounded and we have explained that "[o]ur role in assessing a jury verdict for excessiveness is to assure that compensatory damages awarded to a plaintiff 'encompass no more than the amount that will make the plaintiff whole[.]'"
>
> [207 N.J. at 248-49 (citations omitted).]

In light of these important policies, the Court reiterated the familiar test that a trial judge should not disturb a jury award unless "'so disproportionate to the injury and resulting disability as to shock the conscience.'" Id. at 249 (quoting Baxter v. Fairmont Food Co., 74 N.J. 588, 604 (1977)).

These principles continue to guide our courts but they represent only a starting point in answering the difficult question about when a verdict is "so disproportionate" or "shock[ing] [of] the conscience" as to warrant a trial judge's

_____

(continued)
(slip op. at 5, 10). A petition for certification is pending in the Supreme Court.

intervention because no two plaintiffs and no two juries are the same. A trial judge must begin "with the presumption that [the] verdict is correct" and "view the evidence in the light most favorable to plaintiff in evaluating whether remittitur is appropriate." Id. at 249; see also Johnson v. Scaccetti, 192 N.J. 256, 281 (2007); Baxter, supra, 74 N.J. at 598. In addition, the trial judge must be mindful that the task "is not to bring a generous, but manifestly supportable, verdict down into a range more to [the judge's] liking," but only "to reduce a verdict that is 'shocking' and award in its place 'the highest figure that could be supported by the evidence.'" He v. Miller, supra, 207 N.J. at 250 (quoting Fertile v. St. Michael's Med. Ctr., 169 N.J. 481, 500 (2001)).

When concluding a verdict is excessive, a trial judge must explain how that conclusion and the remitted amount were derived from the record. Ibid.; Fertile, supra, 169 N.J. at 501. In this regard, the Supreme Court has endorsed a trial judge's consideration of "other verdicts" while cautioning "that in doing so '[the trial judge] must give a factual analysis of how the award is different or similar to others to which it is compared.'" He v. Miller, supra, 207 N.J. at 251 (quoting Johnson, supra, 192 N.J. at 281).

The Court in He v. Miller also expounded on the role played by appellate courts in reviewing a remittitur order. Ibid. The Court emphasized that "the jury is the bedrock of our system of justice," ibid., but that the trial judge has the limited power to intervene when comparable verdicts and the judge's own "feel of the case" — because "trial judges see much that juries do not" — move "[t]he court's own informed conscience" to the belief that the verdict is disproportionate and shocking. Id. at 254. Consequently, the Court emphasized that appellate panels "must . . . recognize that their mere disagreement" with the judge's evaluation "will not suffice," and they "must" instead "pay deference to the trial court's 'feel of the case.'" Id. at 255 (quoting Johnson, supra, 192 N.J. at 282).

Interesting is the difference of opinion as to the application of the trial judge's "feel of the case" and the judge's subjective, personal experiences found in the majority and dissenting opinions in He v. Miller. Justice Albin, whose dissenting opinion was joined by the Chief Justice, observed that the majority had "exalt[ed] the trial judge's 'feel of the case' above the jury's duty to decide for itself the quantum of damages . . . [and] undermines" the obligation of appellate courts "to review remittitur motions . . . on the objective evidence of record." Id. at 267 (dissenting opinion). And,

10                                      A-0326-13T3

with respect to the use of "subjective, personal experiences," the Court's dissenting members referred to Chief Justice Hughes's opinion in Baxter in observing that "however much trial and appellate judges are affected by their subjective prejudices and predispositions and life experiences, those 'individualized propensities of mind' must somehow be merged into 'an amalgam of common judicial experience related to the doing of justice,'" and they must "'resist the natural temptation to substitute their judgment for that of the jury.'" Id. at 268 (quoting Baxter, supra, 74 N.J. at 596-97). In a nutshell, it is not the trial judge's conscience but a collective "judicial conscience" that guides a trial judge's examination of a jury's damage award.

This, however, was a minority view, and the majority opinion makes clear that the trial judge's experience — in He v. Miller, the trial judge had been on the bench "for only a few months" but was an experienced practitioner of twenty-two years, id. at 256 (majority opinion) — outweighed the many more decades of collective experience of the appellate judges who objectively reviewed the remittitur order. That is, the majority determined that the trial judge's subjective view that he "had never encountered a like" verdict for such a case — which included the judge's identification of two other trials over which he had

A-0326-13T3

presided since being appointed to the bench within the year —

was entitled to "significant" weight, ibid., and apparently the

greater experience of three appellate judges entitled to little

or no weight. Thus, the trial judge's decision in He v. Miller

— that the case was more akin to "a spectrum of jury awards

. . . rang[ing] between $40,000.00 and $200,000.00," 207 N.J. at

243 — was dispositive[4] apparently because he presided over the

trial, even though the judge's past experiences cannot possibly

be what our courts have long referred to as a trial judge's

"feel of the case."[5] The utilization of the trial judge's past

personal experiences and subjective views is quite problematic,

not only because judges differ,[6] and not only because no two

---

[4]Although endorsed by the majority in He v. Miller, the trial judge there — after advising the jury that there was no "yardstick" by which to assess pain and suffering — then used a $200,000 yardstick to measure the jury verdict.

[5]"Feel of the case" comes from what the judge perceived had occurred in the courtroom during the trial, even at times when the jury was not present. See He v. Miller, supra, 207 N.J. at 254-55 (recognizing that trial judges "see plaintiffs entering and leaving the courtroom each day, observe them when the jury's attention is on another witness or exhibit, and are privy to their interactions and behaviors when the jury is absent from the courtroom during colloquy, conferences, and breaks during proceedings").

[6]The He v. Miller majority acknowledged this, stating "all judges come to the bench with different backgrounds, experiences, perceptions, and views," and recognizing that "judges who have gained experience on the bench in similar trials will have a different, and perhaps better, basis on which to determine
(continued)

similar experiences are quite the same,[7] but also because the process of using these personal experiences defies greatly valued attributes of our judicial system, namely, a party's right to discovery and the right to confront and cross-examine information used to adjudicate the dispute. Because of He v. Miller, a judge may simply rely on past experiences without permitting the parties the right to inquire further or test the sufficiency or accuracy of those experiences. In that way, the process was transformed from an objective to a subjective examination. This interesting problem essentially boils down to Justice Albin's criticism in his dissent when, in referring to Johnson, supra, 192 N.J. at 281, he emphasized that "[i]t is not the [trial] judge's personal conscience but the judicial conscience that controls." He v. Miller, supra, 207 N.J. at 269 (dissenting opinion) (emphasis added).[8]

---

(continued)
whether a particular award is beyond the acceptable to such a degree that it calls for remittitur." 207 N.J. at 253.

[7]The He v. Miller majority also recognized this. See 207 N.J. at 253 (observing that "no two plaintiffs are identical and no two cases are identical").

[8]Indeed, as noted earlier, the first He v. Miller trial judge, who had been on the bench less than a year, found anything over $200,000 shockingly disproportionate, while the second He v. Miller trial judge, who has been a judge for more than thirty years, found nothing remotely shocking about a $500,000 pain and suffering award in the same case.

In any event, the He v. Miller majority opinion is that which guides our disposition of this appeal, and we view that decision as commanding deference to the trial judge's "subjective, personal experiences." With this as the framework to which we are bound, we turn to the trial judge's decision, although we first examine what traditionally constituted the judge's "feel of the case" before considering his subjective view and personal past experiences.

B

In describing his "feel of [this] case," the judge described the considerable educational background of the jury, his view that the jurors were not "rustic[s] in the style of Norman Rockwell," citing DeHanes v. Rothman, 158 N.J. 90, 99 (1999), and that there were no "slackers" on the jury. He also referred to plaintiff as the personification of the "perfect" or "ideal" plaintiff in that he "dressed respectfully," was "always prompt and quietly courteous," was "in obvious discomfort, but he made efforts not to display that discomfort," and "testified with dignity, humility and modesty." The judge found plaintiff's testimony to be "understated and straightforward"; "[i]n terms of his credibility and general appeal," the judge "categorize[d] him in the 99th percentile." The judge also noted that plaintiff did not appear to be "in any way

14

exaggerating the impact this injury has had on his life," and he "responded to excellent cross-examination forthrightly and honestly," concluding it was "not at all a surprise that the jury accepted the testimony of this extraordinarily credible witness." Accordingly, the judge determined "there was a potential for a very sizable plaintiff's verdict" once the jury determined — as it obviously did — that the so-called "low-impact" collision caused the herniated disc.

These observations certainly fall into the "feel of the case" rubric to which our appellate courts have always deferred. Based on these observations, and others set forth in the judge's thorough opinion, he recognized the verdict was "high" and "perhaps at the far end of the bell[-]shaped curve used in statistical analysis" but "not shock[ing] [to] the judicial conscience." If the analysis were to stop here, we would merely state our agreement that the verdict is very high and near the point of being disproportionately high, but we cannot conclude — in light of our requirement to defer to both the jury's view of the evidence and the judge's feel of the case — that it is shocking to the judicial conscience. Indeed, this analysis alone is sufficient to compel our affirmance.

C

A-0326-13T3

Even though the above discussion compels our conclusion, we add the following comments regarding the judge's disclosure of his "subjective, personal experiences" that also supported his denial of the new trial motion. Considering the license provided by the majority opinion in He v. Miller, the trial judge provided the following information:

> I have been sitting as a civil trial judge for the last year, during which I have presided over [forty-one] trials. [Twelve] of those cases settled after jury selection. [Nineteen] were defense verdicts, and only [eight] verdicts awarded damages to a plaintiff. Some of the plaintiff verdicts involved extremely modest damage awards. There were also two mistrials. . . .
>
> Before serving as a civil trial judge, I was a judge in the family division for three years. Before that I was engaged for [twenty-nine] years as a trial attorney, and for my last [twenty] years as a lawyer I did almost exclusively plaintiff's injury cases. I did try two cases in defense of injury claims, but I believe I had more than 100 civil injury trials as plaintiff's counsel where a jury was selected. I have been asked to do continuing legal education lectures more than [forty] times by various organizations. I have been asked several times by the New Jersey Defense Association to speak at their annual daylong trial seminar. I was [c]ertified by the Supreme Court as a Civil Trial Attorney. I serve on the Supreme Court Committee on the Rules of Evidence and am just now completing my third two-year term on that Committee. I wrote two books for New Jersey lawyers in the injury field. One of [the] books is updated and reissued annually. Researching and writing the annual revision has kept me

16

current with the law and with verdict trends.

The judge also described a case over which he presided that he found had some similarities; that case settled for $2,500,000 prior to the commencement of the jury's deliberations.[9] The judge recognized the many differences — including that plaintiff suffered a fractured ankle which, after surgery, caused her "substantial residual pain labeled as complex regional pain syndrome." We have no ability to examine further this purported

---

[9]The trial judge also noted that neither plaintiff nor defendants cited comparable verdicts until defendants submitted their reply brief. Finding a lack of authentication, the judge refused to consider defendants' "anecdotal information." The record on appeal does not disclose the authentication problem. We would note, however, that we are troubled by the use of reports of jury verdicts in the New Jersey Law Journal or other similar publications, or citations to our unpublished opinions, as evidence of comparable jury verdicts. The former are based on hearsay or multiple levels of hearsay. And, in many instances, reports contained in the New Jersey Law Journal's weekly "Verdict Search" section, are one-sided. See, e.g., 218 N.J.L.J. 1099 (Dec. 22, 2014) (advising that the report of the verdict and the underlying circumstances was "based on information provided by plaintiff's counsel" and "[d]efense counsel declined to contribute"); 218 N.J.L.J. 31 (Oct. 6, 2014) (same); 216 N.J.L.J. 843 (June 23, 2014) (same); 216 N.J.L.J. 275 (Apr. 28, 2014) (same). The use of unpublished opinions, by Rule 1:36-3, are not precedential and "shall [not] be cited by any court"; we assume that the prohibition on citation also limits a court's use of unpublished opinions as a source of comparable verdicts. In any event, defendants have not argued in this appeal that the judge's refusal to consider whatever information was provided to him (this information is not in the record on appeal) was erroneous.

"comparable" because all we know of it is what is stated in the judge's written decision.

Although a slim majority of the Supreme Court has held that this information is relevant, we conclude that, to the extent it has any bearing, the trial judge's subjective personal experiences — while different from or obviously at odds with those of the original trial judge in He v. Miller[10] — support his determination that the verdict was not excessive.

IV

With or without the trial judge's personal experiences and subjective view, we would affirm the order denying a new trial or remittitur because of our obligation to honor the jury's assessment of the evidence and our deference to the trial judge's "feel of the case." In objectively reviewing the

---

[10]We cannot help but observe that the version of "the judicial conscience" applied by the first trial judge in He v. Miller would undoubtedly have led to the issuance of a remittitur here, and the version applied by the trial judge here would undoubtedly have led to a rejection of a remittitur in He v. Miller. The one difference, however, is that we do not view the trial judge here as having allowed his prior experiences to dominate his view of this verdict as we believe occurred in He v. Miller. Instead, before even discussing his own past experiences and background, the judge described the injuries, the plaintiff's great jury appeal, and his own "feel of the case" as warranting a denial of defendants' post-verdict motion before providing his experiences as further support for his order. As we have said, those observations are sufficient, and they convincingly demonstrate the verdict should be upheld.

evidence and the judge's description of what he observed throughout the trial, we conclude that although very high, this verdict cannot be said to be shocking to the judicial conscience.

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-0326-13T3