NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-5273-13T3

JOSEPH A. BERKOWITZ,

    Plaintiff-Respondent,

v.

SUSAN J. SOPER,

    Defendant-Appellant.

_____

> **APPROVED FOR PUBLICATION**
>
> **January 20, 2016**
>
> **APPELLATE DIVISION**

Submitted September 30, 2015 — Decided January 20, 2016

Before Judges Fuentes, Koblitz and Gilson.

On appeal from Superior Court of New Jersey, Law Division, Middlesex County, Docket No. L-7521-11.

Rudolph & Kayal, attorneys for appellant (Stephen A. Rudolph, on the brief).

Martin Kane & Kuper, LLC, attorneys for respondent (Brian E. Yesalonis, on the brief.

The opinion of the court was delivered by

FUENTES, P.J.A.D.

Defendant Susan J. Soper was involved in an automobile accident with plaintiff Joseph A. Berkowitz on November 9, 2009. Plaintiff described the collision as "a tremendous hit from behind."  Because defendant was hospitalized at the time of

trial, the jury did not hear her countervailing description of the force of the impact.

Plaintiff brought suit against defendant in October 2011, only a month before the expiration of the two-year statute of limitation. N.J.S.A. 2A:14-2(a). Plaintiff's damages were based on his account of the severity of his back pain and diagnostic tests that showed disc compression and bulges in the lumbar region of his spine. Plaintiff testified he is able to perform the activities of daily living, albeit with a certain degree of pain and some assistance from his wife. His mobility is also restricted as a consequence of the pain. He was treated with physical therapy and epidural steroid injections in the lumbar region of the spine.[1]

This was plaintiff's third automobile accident over a nine-year period that involved injury to his back. Plaintiff's expert witness opined that this accident exacerbated the preexisting injuries caused by the two previous accidents and found plaintiff had radiculopathy consisting of pain radiating down from the lumbar region of his spine to his right leg. Other than taking prescription pain medication, plaintiff had

---

[1] Plaintiff's automobile insurance policy contained a verbal threshold provision requiring him to prove he sustained a permanent injury to a "body part or organ, or both, [that] has not healed to function normally and will not heal to function normally with further medical treatment." N.J.S.A. 39:6A-8(a).

stopped receiving any form of treatment for his injuries nearly two years before the start of trial in May 2014.

The case proceeded through discovery and mandatory, non-binding arbitration. The arbitrator ruled in plaintiff's favor on liability, finding defendant one hundred percent liable for the accident. The arbitrator also found plaintiff's injuries were sufficient to overcome the verbal threshold restrictions in his auto policy and awarded him $40,000 in compensatory damages. Because plaintiff's injuries did not prevent him from performing his work-related activities as a salesperson, the arbitrator did not award any economic damages.

Although the record before us does not disclose which party sought a trial de novo pursuant to Rule 4:21A-6(c), the matter was eventually listed for trial on July 29, 2013. The trial date was adjourned thereafter five times before the case was finally tried before a jury over a three-day period, starting on May 5, 2014. The factual testimony presented to the jury came entirely from plaintiff, his wife, and a man who identified himself as plaintiff's friend and customer. All of the physicians who treated plaintiff related to the injuries allegedly caused by this accident declined to testify at trial.

At the conclusion of plaintiff's direct presentation to the jury, the trial judge granted plaintiff's motion for a directed

verdict on liability pursuant to <u>Rule</u> 4:37-2(b). Thereafter, defendant called only one witness, a physician who was prequalified as an expert witness. His testimony was presented to the jury in the form of a <u>de bene esse</u> videotaped deposition.

The jury began deliberating at 9:46 a.m. and reported its verdict at 11:22 a.m., awarding plaintiff $2,000,000 in compensatory damages for pain and suffering. The trial court denied defendant's motions for a new trial and for remittitur. The court also granted plaintiff's motion for counsel fees and costs, pursuant to <u>Rule</u> 4:58-2, based on defendant's failure to accept an Offer of Judgment filed by plaintiff on April 21, 2014, pursuant to <u>Rule</u> 4:58-1, indicating his willingness to accept a judgment against defendant for $30,000.

In this appeal, defendant argues the trial judge committed multiple reversible errors in the course of deciding a series of evidential issues that arose during the trial, but primarily during plaintiff's direct testimony. Defendant also argues she was particularly prejudiced by the trial judge's refusal to adjourn the trial date to accommodate a serious and unforeseen medical emergency that caused her to be hospitalized two business days before the scheduled trial date. This medical condition prevented her from appearing at trial or arranging to present her testimony via a <u>de bene esse</u> deposition.

Independent of these issues, defendant argues the trial judge erred when he denied her motion for a new trial or to remit the jury verdict. Defendant argues the amount of compensatory damages awarded by the jury under these circumstances is shockingly excessive, against the weight of the evidence presented at trial, and constitutes a clear miscarriage of justice.

We agree with defendant's arguments and reverse. We conclude the trial judge abused his discretion in denying defendant's request to adjourn the trial without considering or applying the standards codified by the Supreme Court in Rule 4:36-3(b). The record further shows: (1) plaintiff and his counsel made multiple comments to the jury concerning plaintiff's need for surgery, despite a lack of any expert testimony to support this medical conclusion; (2) plaintiff testified about having suicidal ideations connected to the injuries he allegedly sustained in this accident, without expert testimony to support any psychiatric or psychological harm; and (3) plaintiff and his wife both made comments as part of their direct testimony that specifically and improperly referred to the quantum or adequacy of a potential monetary damage award. The cumulative effect of these errors had the capacity to inflame the jury's passion thereby depriving defendant of her

right to a fair trial. Finally, reviewing the totality of the evidence presented at trial in the light most favorable to plaintiff, the jury's award of $2,000,000 in compensatory damages shocks our collective judicial conscience because it is grossly disproportionate to the injuries plaintiff sustained as a proximate cause of this automobile accident. Jastram ex rel. Jastram v. Kruse, 197 N.J. 216, 228 (2008). A new trial as to both liability and damages is the only way to counteract this clear miscarriage of justice.

I

Plaintiff was thirty-five years old at the time the 2002 Toyota Camry he was driving was rear-ended by the 2000 Oldsmobile driven by defendant. Plaintiff described the impact as "a sudden, boom, I get this tremendous hit from behind." When asked whether he stepped out of his car, plaintiff responded: "I was a bit shaken up in the immediate aftermath. My . . . glasses had gone flying, everything in the car was in total disarray." Although he eventually stepped out "and went around the car to check if there [was] any damage[,]" he did not describe whether the car in fact sustained any damage.

Plaintiff did not remember at trial whether he received any medical attention at the scene. As a means of refreshing his recollection, plaintiff's counsel showed him a copy of the

police report of the accident that indicated he was evaluated at the scene by emergency medical personnel who found he did not require medical attention. As described in the report prepared by the police officer who responded to the scene, plaintiff's car was stopped in traffic at a red light when the car driven by defendant "bumped" into his vehicle from behind. Although neither car sustained any damage, the police report noted plaintiff's car had preexisting damage unrelated to this accident.

Plaintiff drove away from the scene of the accident and continued his activities for the remainder of the day. Plaintiff was at the time employed as a wine salesperson. He emphasized he had an important business meeting that day related to the upcoming holidays in October through December. He drove to and attended the meeting without experiencing any pain. However, he described his condition as "disjointed" or "disoriented." He felt some pain as he drove home and became worried that this latest accident could have "further exacerbated" injuries he sustained in two previous automobile accidents in 2002 and in 2005.

Plaintiff decided to go to Kimball Medical Center (KMC) later that evening. The clinical examination conducted by the medical staff and the x-rays of his back taken at KMC did not

reveal any injuries. Plaintiff was discharged from KMC that same night. He was told to consult with his physician as needed, and was given pain medication. Because his back pain did not subside, plaintiff consulted with a number of physicians to explore treatment options. He received physical therapy for a period of time and was treated by physicians in a medical group who specialized in pain management. They administered epidural steroid injections in the lumbar region of the spine. He was ultimately diagnosed as suffering from lumbar radiculopathy.

In the course of his direct examination, plaintiff repeatedly described the treatment he received in a manner that went beyond his status as a lay witness. As examples, plaintiff characterized the fourth epidural injection he received as "very unusual" and said his only medical option after the epidural injections was surgery. These comments triggered repeated objections by defense counsel, which were sustained by the trial judge. At one point, the judge addressed plaintiff directly and gave him the following admonition in the presence of the jury:

> [Y]ou can't keep going on about what - - the
> questions are what were done to you, not why
> was it done, not what the medical literature
> is, none of that. You can't do that because
> you're not a doctor.

Immediately after the trial judge gave these instructions to plaintiff, his attorney asked him: "Did you consider surgery after it was recommended by Dr. Dubois?" This prompted an immediate objection by defense counsel. The following exchange occurred at a sidebar conference:

> THE COURT: [Addressing plaintiff's counsel] What about [Dr.] Becan, what does Becan - - because he's your witness, <u>what does Becan say about the surgery</u>?
>
> PLAINTIFF'S ATTORNEY: <u>He doesn't say anything</u>.
>
> DEFENSE ATTORNEY: I don't think he says - -
>
> THE COURT: Well, <u>let's stay away from surgery</u> - -
>
> PLAINTIFF'S ATTORNEY: Okay.
>
> THE COURT: - - [B]ecause . . . anything that [Dr.] Dubois says . . . it has no value just to prove that Dubois said it. It only has value if it's a valid - - you know, that it was recommended because he needs it, potentially needs it, which then . . . you got to bring Dubois.
>
> DEFENSE ATTORNEY: Here to say that.
>
> THE COURT: Yeah, <u>Dubois either has to say it or another doctor has to say it that's here testifying</u>.
>
> [(emphasis added).]

Plaintiff had physical therapy "quite a few times" as a means of "trying to stretch me out." He felt pain in his lower back that radiated into his right leg. He testified he had

"developed significant what's called drop foot because the pain was going straight down my leg."[2]

Plaintiff testified that the physical therapy he received at the pain management center resolved his neck pain "pretty quickly." Without objection from defense counsel, plaintiff testified he was told the results of a magnetic resonance imaging (MRI) study of the lumbar spine performed shortly after the accident revealed he had "bulging discs, maybe a couple of them at that point, and [he] was told that one of them was . . . pressing against the nerve." Counsel also asked plaintiff the results of a second MRI study performed in October 2010. Plaintiff testified his treating physicians ordered a second MRI because he "was still in significant pain." Again without objection, plaintiff speculated and expanded on the medical reasons for the second MRI:

> I think the doctors really wanted to get a
> clearer picture of . . . what was going on
> in there, you know, maybe get a better idea
> of what type of physical therapy might be
> able to help me . . . .

---

[2] Plaintiff's expert did not address plaintiff's gait or manner of ambulation in his testimony before the jury. The expert noted in his report that plaintiff walked "with an antalgic gait pattern" and had "mild weakness of toe walking on the right as compared to the left." This report was not admitted into evidence or made available to the jury.

Although plaintiff did not stop working at any time after the accident, he testified he was "literally confined to [his] house." Furthermore, despite the absence of any psychiatric evidence, history of mental illness, or evidence he sought a more aggressive pain management approach, plaintiff testified, without objection, as follows:

> I was in the most excruciating pain imaginable. I - - I wanted to commit suicide a couple of times. I told my wife it was that bad.
>
> <u>And we did a lot of research on what could possibly be done in a situation like this</u>. And what we came up with was that it was one of two things. It was either injections, epidural injections right into the spine, or it was go for surgery. And I - - I didn't want to go for surgery, and never did. So I ended up having my dad - - I couldn't drive. I couldn't even get behind the wheel of a car. I could barely - - I couldn't walk.
>
> My dad came from New York to pick me up and drive me to Dr. Dubois for those injections.
>
> Q. The pains you were having in that time, during the summer and fall of 2009 - - I'm sorry, 2010, had you ever had that type of pain prior to the November 2009 accident?
>
> A. No.
>
> . . . .
>
> I didn't even know pain like that could exist.
>
> Q. And what did Dr. Dubois do for you?

A. Well, Dr. Dubois did what Dr. Dubois does, and that is he gave me epidural injections right into the spine. There was supposed to be a series of three injections. Ultimately, he ended up doing the fourth, which is - - which is highly unusual.

I got some relief after the first couple, not much after - - after the third at all. And the fourth did nothing. And at - - at which he told me that my only option is to go to surgery.

Q. And did you consider surgery at that time?

DEFENSE COUNSEL: I'd like to object to this line of questioning. There's no - - Mr. Berkowitz is not an expert as to surgery or - -

THE COURT: Well, yeah. It's a little late in the game. But, yeah, you can't keep - - he can't keep - -

. . . .

Yeah. He can't keep - - you can't keep going on about what - - the questions are what were done to you, not why was it done, not what medical literature is, none of that. You can't do that because you're not a doctor.

[(emphasis added).]

The trial judge's comments and directions went unheeded. In response to his attorney's questions, plaintiff continued to refer to statements and advice he received from other physicians whom allegedly opined he should have surgery. Plaintiff completed his direct testimony by describing the pain associated

with engaging in his daily life activities. He testified that his job as a wine salesperson requires him to stand around liquor stores. He has cutback and outright stopped many job-related promotional activities such as wine tastings. He cannot sit or stand for extended periods of time without experiencing severe pain. By the time he arrives home at the end of his work day, his pain level "is pretty bad." He is hesitant to play with his children and feels pain when he does so.

Defense counsel's cross-examination consisted primarily of retracing plaintiff's experiences and injuries related to the two previous automobile accidents. Defense counsel also focused on the course of treatment plaintiff followed after this accident, which consisted of physical therapy at a place called "Hands On Physical Therapy." Records showed plaintiff stopped receiving physical therapy in the middle of January 2010. This was approximately a week before plaintiff had his first MRI. Plaintiff also did not have any other form of treatment, other than opiate-based prescription pain medication, since January 6, 2012. Thus, plaintiff did not have any treatment during the twenty-eight months preceding the trial that started in May 2014.

Plaintiff's wife Shaindy Berkowitz testified on her husband's behalf. She did not have a per quod claim. She

corroborated plaintiff's testimony and described the physical limitations caused by his back pain. According to Mrs. Berkowitz, during the period of time plaintiff was "homebound," in addition to being a wife and mother, she became "a nurse, a psychologist, [and] a doctor." Finally, without objection from defense counsel, Mrs. Berkowitz testified that she knew her husband "would have easily given up at the time ten million dollars just to not have that kind of - - of pain."

Before the start of trial, but long after the end of the discovery period, the trial court granted plaintiff's motion to call Dr. Arthur Becan as an expert witness, overruling defendant's objection. Although he used to practice orthopedic surgery with subspecialties in sports medicine and the spine, Dr. Becan is not board certified in any specialty field of medicine, including orthopedics. He also no longer sees patients. In the five years preceding the start of this trial in 2014, Dr. Becan has exclusively dedicated himself to serving as an expert witness in personal injury cases.

Dr. Becan examined plaintiff for one hour, reviewed his medical history, and opined the accident caused an aggravation of a preexisting "lumbar spine pathology" related to two previous automobile accidents. He diagnosed plaintiff as having a bulging disc at L2—3 that was not "present" in a previous MRI

study conducted before the November 2009 accident. He also opined that plaintiff suffers from an acute right side radiculopathy that causes radiating pain from his lower back down to his right leg.

Defendant called Dr. Francis Deluca as an expert. Dr. Deluca is board certified as an orthopedic surgeon and a diplomat of the American Board of Orthopaedic Surgery since 1977. He has been practicing medicine as an orthopedic surgeon for thirty-five years. His professional time is equally divided between seeing patients, which includes performing surgery, and testifying as an expert witness on behalf of defense attorneys in personal injury cases. This also includes conducting independent medical examinations of plaintiffs or claimants.

As we previously noted, defendant presented Dr. Deluca's testimony to the jury in the form of a videotaped <u>de bene esse</u> deposition. Dr. Deluca testified he examined plaintiff on August 9, 2012. At his request, plaintiff described his medical history, which included a car accident in 2001 for which he received physical therapy. Dr. Deluca described plaintiff's gait as "normal." He testified that plaintiff was able to partially dress and partially disrobe without difficulty, and get on and off the examination table without any problems. In

short, Dr. Deluca found plaintiff was able to perform all of the normally anticipated life activities without any difficulty.

Dr. Deluca physically examined plaintiff's lower back, also known as the lumbar region of the spine, and found he "had a normal curve in his back." There were no indications of muscle spasms. Dr. Deluca opined that plaintiff did not sustain a permanent injury related to this accident. He found plaintiff suffers from "a degenerative, worn out spine."

## II

We start our legal analysis by first addressing the trial court's failure to grant defense counsel's request to adjourn the trial to accommodate defendant's unforeseen medical emergency. The case was originally scheduled for trial on July 29, 2013. It was thereafter adjourned to September 30, 2013, by the Civil Division Manager's Office. On September 9, 2013, plaintiff moved to submit an expert report after the discovery period had long ended. Defendant filed opposition to the motion on September 20, 2013. For reasons not disclosed in the record, the trial date was adjourned pending the outcome of plaintiff's motion. By order dated October 11, 2013, the court denied plaintiff's motion to submit an untimely expert report, and scheduled the case for trial on November 12, 2013.

On November 8, 2013, plaintiff moved for reconsideration of the order denying his motion to submit the untimely expert's report. The court heard oral argument and granted plaintiff's motion for reconsideration on November 22, 2013. This order contains a handwritten notation indicating that "counsel will speak to [the Presiding Judge of the Civil Division] to extend trial date." The trial date was thereafter rescheduled to December 16, 2013. Again, without explanation, the Civil Division Manager's Office rescheduled the trial to February 10, 2014.

By letter dated February 26, 2014,[3] addressed to the Civil Presiding Judge, plaintiff requested a second adjournment of the trial. As explained by plaintiff's counsel:

> In preparing my client for trial yesterday, he advised me that he is beginning a new job on that date [March 3, 2014]. I advised him about the importance of the trial and his need to make himself available. He attempted to speak with the new employer and was told if he could not be there next week, then he would lose his job.
>
> Given this unfortunate circumstance, I am respectfully requesting that the matter be adjourned and be given a new preference trial date of May 5, 2014.

---

[3] Plaintiff's counsel noted in this letter that the case was then scheduled for trial on Monday, March 3, 2014. The record before us does not contain any explanation documenting how the February 10, 2014 trial date was rescheduled to March 3, 2014.

Defense counsel consented to plaintiff's request to adjourn the trial date, evidencing the type of professional courtesy customarily extended to a fellow member of the Bar.

On May 5, 2014, defense counsel appeared in court, as directed, and requested an adjournment of the trial to accommodate his client's unforeseen medical emergency. Defense counsel informed the court and plaintiff's counsel that defendant had been hospitalized the previous Thursday, May 1, 2014, "for a heart issue." Under these circumstances, defense counsel requested "a brief adjournment to allow her to testify, and at least be here on her own behalf." Because plaintiff's counsel had not deposed defendant, defense counsel informed the court that her version of how the accident occurred, including the severity of the impact, had not been memorialized.

Defense counsel informed the court that based on her answers to interrogatories, he expected defendant to testify that plaintiff abruptly and unnecessarily stopped short, causing her to collide with his car. Consistent with his duty of candor to the court, plaintiff's counsel corroborated defense counsel's representations in this respect. Defense counsel also informed the court he needed defendant to identify and authenticate a number of photographs depicting the lack of damage to her car.

Despite the facially legitimate reasons offered by defense counsel in support of his application to adjourn the trial, the record shows the judge believed only the Presiding Judge of the Civil Division had the legal authority to adjourn the case.

> THE COURT: Well, look, the problem is if you found out last week . . . the only person at that juncture [who] has the authority to grant an adjournment up until and including right now is the presiding judge. . . . I have no authority to grant it.
>
> . . . .
>
> The motion is denied. It's too late now. It's too late now. . . . [T]he time to deal with this was on Friday, and maybe she could have been - - her testimony de bene esse could have been taken before she went into the hospital if it was that critical.
>
> I'm not finding fault with anybody, because in the real world I don't envision liability being a serious issue in the case. And if the defendant really felt that it was, then they would have taken the steps necessary in a timely fashion.

A judge deciding whether to grant or deny an application to adjourn a civil trial must apply the standards established by the Supreme Court in Rule 4:36-3(b):

> An initial request for an adjournment for a reasonable period of time to accommodate a scheduling conflict or the unavailability of an attorney, a party, or a witness shall be granted if made timely in accordance with this rule. The request shall be made in writing stating the reason for the request and that all parties have consented thereto. The written adjournment request, which shall

be submitted to the civil division manager, shall also include a proposed trial date, agreed upon by all parties, to occur as soon as possible after the problem requiring the adjournment is resolved. If consent cannot be obtained or if a second request is made, the court shall determine the matter by conference call with all parties. Requests for adjournment should be made as soon as the need is known but in no event, absent exceptional circumstances, shall such request be made later than the close of business on the Wednesday preceding the Monday of the trial week. No adjournments shall be granted to accommodate dispositive motions returnable on or after the scheduled trial date.

[(emphasis added).]

Here, the judge denied defendant's request for an adjournment under the mistaken belief that only the Presiding Judge of the Civil Division had the authority to decide the application. The plain language in Rule 4:36-3(b) does not confer the authority to adjourn cases exclusively to the Presiding Judge of the Civil Division. Indeed, when the Supreme Court intended to confer a specific case-management responsibility to the Presiding Judge of a Division, it did so using straightforward unambiguous language. Cf. R. 3:9-3(g) ("After the pretrial conference has been conducted and a trial date set, the court shall not accept negotiated pleas absent the approval of the Criminal Presiding Judge based on a material change of circumstance, or the need to avoid a protracted trial

or a manifest injustice.") (emphasis added). The customary practices developed in any particular vicinage cannot take precedent over a Supreme Court rule.

When the controversial case management reforms known as "Best Practices" were implemented more than fifteen years ago, there were many members of our State's legal community who questioned whether strict enforcement of procedural rules would undermine the judiciary's commitment to fairness and flexibility to respond to unforeseen events. Our distinguished colleague Judge Pressler, one of the key figures who supported these reforms, never lost sight of the fundamental principles that must always guide judicial decisions.

> The Best Practices rules were designed to improve the efficiency and expedition of the civil litigation process and to restore state-wide uniformity in implementing and enforcing discovery and trial practices. They were not designed to do away with substantial justice on the merits or to preclude rule relaxation when necessary to secure a just determination.
>
> [Tucci v. Tropicana Casino & Resort, Inc., 364 N.J. Super. 48, 53 (App. Div. 2003) (internal citations omitted).]

Here, the denial of defense counsel's application for "a brief adjournment" of the trial to accommodate defendant's

medical condition[4] that occurred two court days before the scheduled trial date constituted reversible error because it was predicated on an erroneous understanding by the trial judge of his authority under Rule 4:36-3(b). Most importantly, the denial of the adjournment under these circumstances was inconsistent with the fundamental principles of justice and fairness that must guide all judicial decisions. We also disagree with the trial judge's assessment of the prejudice to defendant by her inability to attend the trial. Defendant was the only witness who could have provided the jury with an alternative account of what caused the accident, and more particularly, the severity of the impact.

The appellate record includes four color photographs depicting the condition of defendant's car after the accident. Defendant provided these photographs to plaintiff in the course of discovery. These photographs show defendant's car did not

---

[4] The appellate record includes a letter dated May 12, 2014, written and signed by Dr. Andras Peter, addressed "to whom it may concern," in which Dr. Peter states that defendant was under his medical care. She was hospitalized from May 1, 2014 to May 5, 2014, and treated for "congestive heart failure." Dr. Peter requested to "[p]lease excuse her absence from court." We are compelled to highlight that the letter is dated six days after the trial ended, and was thus not available to the trial judge at the time he denied defense counsel's request to adjourn the trial. That being said, the judge should have granted defense counsel's request because defendant's unavailability satisfied the "exceptional circumstances" standard under Rule 4:36-3(b).

sustain any visible damage, thus corroborating her characterization of the impact as being nothing more than a relatively minor bump. However, defense counsel was not able to introduce these photographs into evidence because defendant was not available to authenticate them and testify as to when they were taken.

Given the excessiveness of the jury's compensatory damages award, it is reasonable to conclude the jury may have been unduly influenced by the one-sided account of the severity of the collision. Had defendant been permitted to testify, her account may have provided the balance necessary for the jury to produce a reasonably sustainable verdict.

### III

Plaintiff's counsel's misrepresentations to the jury in his opening statement exacerbated this prejudice and improperly capitalized on defendant's involuntary absence from the trial. Specifically, plaintiff's counsel made the following comments in the course of his opening statement:

> The defendant, if she testifies, will admit that she did indeed hit my client in the rear. So by her own testimony she's going to admit to you that she failed to meet her responsibility, that's how this accident happened. And as a result of that collision my client suffered injuries.

At the time he made these representations to the jury, plaintiff's counsel knew defendant was not testifying at trial due to her medical condition. Furthermore, because he did not take defendant's deposition, the only version of defendant's account of the accident plaintiff's counsel had was in the form of her responses to plaintiff's interrogatories. Defendant gave the following response when asked "to describe in detail [her] version of the accident":

> I was on Route 18 North and I had stopped at a red light. The light turned green and the car in front of mine began to proceed forward. That car then stopped suddenly and I impacted the rear of the vehicle.

Pursuant to Rule 1:7-1(a), a "plaintiff in a civil action, unless otherwise provided in the pretrial order, shall make an opening statement." (Emphasis added). Thus, as our Supreme Court has made clear, "[o]pening statements are mandatory . . ., unless the pretrial order provides otherwise." Passaic Valley Sewerage Comm'rs v. Geo. M. Brewster & Son, Inc., 32 N.J. 595, 605 (1960). The Court has also made clear the ethical and evidential parameters that limit what an attorney can say to a jury in an opening statement:

> The fundamental purpose thereof is a most important factor in considering a question of legal adequacy. That purpose is to do no more than inform the jury in a general way of the nature of the action and the basic factual hypothesis projected, so that they

> may be better prepared to understand the evidence. The judge already knows what the case is all about from the pretrial order. Counsel must be summary and succinct. Proposed evidence should not be detailed and it will be little more than an outline, quite frequently a fairly indefinite one by reason of the nature of the case. <u>In no sense can it be argumentative or have any of the attributes of a summation. Nothing must be said which the lawyer knows cannot in fact be proved or is legally inadmissible.</u>
>
> [<u>Ibid.</u> (emphasis added) (internal citations omitted).]

Here, plaintiff's counsel's opening statements violated the Court's clear injunction in <u>Passaic Valley</u>. By using the phrase "if she testifies" to refer to defendant's possible trial testimony, counsel implied defendant was in fact available to testify, a prospect he knew as a matter of fact was not possible. Furthermore, counsel's characterization of defendant's version of the accident was not supported by defendant's certified answers to plaintiff's interrogatories, the only evidence counsel had of defendant's account of the accident.

In the course of his opening statement, plaintiff's counsel also made repeated references to plaintiff's need for surgery as opined by plaintiff's treating physicians, despite knowing, with absolute certainty, that none of these physicians would be testifying at trial. Counsel told the jury that in an effort to

find some relief for his back pain and the pain caused by radiculopathy, plaintiff:

> Went to a doctor in New York, a Dr. Michael Dubois, at the NYU Pain Management Center. And that doctor did something for Joseph that no one had ever done before, something that no one even recommended to have done before, that's give him in - - epidural steroid injections.
>
> . . . .
>
> So he actually did work for a period of time. He actually had four injections in his back by Dr. Dubois. Each one of the first three seemed to help. Unfortunately, with the last one he got to a point where it wasn't helping anymore. <u>So Dr. Dubois said, well, at this point your options are surgery or physical therapy to try to go on with where you are</u>. He chose physical therapy. He'll tell you why he didn't choose the surgery on his back, which I think you'll understand why. So he had some more physical therapy.
>
> [(emphasis added).]

When plaintiff's counsel made this representation to the jury as part of his opening statement, he knew Dr. Dubois was not going to testify at trial. Counsel also knew his expert witness, Dr. Becan, would not testify or opine about surgery as an option to treat plaintiff's back pain.

Plaintiff's counsel also mentioned the medical opinion concerning surgery allegedly made by Dr. Schenker, a neurologist, whom counsel claimed "found that [plaintiff] had a

severe acute right-sided L-5 radiculopathy." Finally, as an example of the most egregious form of improper comment in an opening statement, plaintiff's counsel informed the jury:

> Here, Mr. Berkowitz, because that's exactly what he was having, he was having lower back pain radiating right into his right leg. <u>So exactly what he was complaining about is what the neurologist told him, confirmed for him is what his problem was</u>.
>
> The only problem was no one could do anything for him except surgery. And he had a choice to make then. It's you have the surgery, or try to live with it. And that's what he's tried to do since. He's tried to deal with it. It affected him at home; it's affected him at work.
>
> [(emphasis added).]

At the time plaintiff's counsel represented to jury that plaintiff had been told by a neurologist that his only options were to live with lower back pain or have surgery, counsel knew he would not present any competent expert testimony to support this claim. Such a deliberate misrepresentation of the evidence he expected to produce at trial constitutes a violation of the duty of candor an attorney is bound to follow in an opening statement. The Supreme Court expected nothing less than absolute adherence to this duty when it emphatically proclaimed nearly fifty-six years ago in <u>Passaic Valley</u>, <u>supra</u>: "Nothing must be said which the lawyer knows cannot in fact be proved or is legally inadmissible." 32 <u>N.J.</u> at 605; <u>see also</u> <u>Szczecina v.</u>

PV Holding Corp., 414 N.J. Super. 173, 178 (App. Div. 2010). The prejudice caused by plaintiff's counsel's material misrepresentations to the jury in his opening statement compounded the inadmissible, opinion-based testimony the jury heard numerous times from plaintiff in the course of his direct testimony.

IV

Finally, we address defendant's argument attacking the validity of the jury's verdict awarding compensatory damages of two million dollars as excessive. Although we agree the jury's verdict is excessive and therefore invalid, we are bound to describe the analytical principles that have lead us to this conclusion.

The fundamental purpose of tort law is to ensure "that wronged persons should be compensated for their injuries and that those responsible for the wrong should bear the cost of their tortious conduct." People Express Airlines, Inc. v. Consol. Rail Corp., 100 N.J. 246, 255 (1985). Our State's Constitution and our principles of common law also guarantee a party injured by the tortious conduct of another the "right to have a jury decide the merits and worth of her [or his] case." Johnson v. Scaccetti, 192 N.J. 256, 279 (2007). Indeed, our

State's Constitution provides that: "The right of trial by jury shall remain inviolate. . . ." N.J. Const. art. I, ¶ 9.

In Johnson, supra, Justice Albin explained how our system of civil justice provides monetary compensation to those who have been injured by the negligence of others.

> Our civil system of justice places trust in ordinary men and women of varying experiences and backgrounds, who serve as jurors, to render judgments concerning liability and damages. Determining just compensation for an accident victim, particularly when the damages are not susceptible to scientific precision, as in the case of pain and suffering damages, necessarily requires a high degree of discretion. That is so because there is no neat formula for translating pain and suffering into monetary compensation.
>
> [192 N.J. at 279-80.]

As the trial judge did in this case, judges instruct jurors in a civil case using standardized language that emphasizes the imprecise nature of a process that seeks to quantify human "pain and suffering" in monetary terms.

> The law does not provide you with any table, schedule or formula by which a person's pain and suffering disability, loss of enjoyment of life may be measured in terms of money. The amount is left to your sound discretion. . . . You each know from your common experience the nature of pain and suffering, disability, impairment and loss of enjoyment of life and you also know the nature and function of money. The task of equating the two so as to arrive at a fair and reasonable award of damages requires a high order of

human judgment.  For this reason, the law can provide no better yardstick for your guidance than your own impartial judgment and experience.

[Id. at 280 (quoting Model Jury Charge (Civil) 8.11E "Disability, Impairment and Loss of the Enjoyment of Life, Pain and Suffering" (December 1996)).]

We thus approach any challenge to the decision reached by a jury in the area of monetizing human "pain and suffering" with great trepidation and deference.  As judges, we are not at liberty to substitute our judgment for that of the jury merely because we would have reached a different outcome.  Baxter v. Fairmont Food Co., 74 N.J. 588, 598 (1977).  Neither the trial judge nor us as appellate judges are legally entitled to assume the role of "a thirteenth and decisive juror."  Ibid. (quoting Dolson v. Anastasia, 55 N.J. 2, 6 (1969)).  Indeed, our role as appellate judges is further circumscribed by the deference we owe to the trial judge's "'feel of the case,' given that, on appeal, review is confined to 'the cold record.'"  Johnson, supra, 192 N.J. at 282 (quoting Baxter, supra, 74 N.J. at 600).

In He v. Miller, 207 N.J. 230, 251 (2011), the Supreme Court used the trial court's decision to grant the defendant's motion for remittitur as an opportunity "to explain in more detail both the basis on which a trial court may rely in ordering remittitur and the level of detail that the court must

include in its explanation of the reasons for its decision to grant that remedy." Here, because the trial judge denied defendant's motion for remittitur, we will limit our review to determining whether the judge's decision to uphold the jury's damage award is supported by the evidence presented at trial as well as the relevant legal principles governing the exercise of the court's authority.

The Court in He directed trial courts to afford the parties the opportunity to educate the judge about the reasons why remittitur, or alternatively upholding the jury's verdict, is a legally sustainable outcome. Id. at 254. This education consists primarily of providing the judge with a representative sample of jury awards involving similar cases. This information is intended to provide the trial judge with a basis for gauging whether the award in the case is so wide of the mark it renders its enforceability a miscarriage of justice under the law. Ibid. See also Mickens v. Misdom, 438 N.J. Super. 531, 538-59 (App. Div.), certif. denied, 221 N.J. 287 (2015).

Here, the record shows the trial judge did not follow this approach. The judge candidly admitted he did not know "any of the cases or the people involved in them that were cited by either party . . . in terms of the [He] analysis [.]" The record shows the judge based his decision to uphold the jury's

$2,000,000 award on two principal factors: plaintiff's life expectancy (39.2 years) and his socioeconomic status.

Despite the absence of a claim for economic damages, the judge found that when considered in the context of plaintiff's "lifestyle," an award of $2,000,000 was "not an absurd amount." In reaching this conclusion, the judge considered plaintiff's testimony describing how his injury interfered with his religious practices[5] and his activity and responsibility as a parent and spouse as factors the jury could have considered in determining the reasonableness of the compensatory damages award. In light of these considerations, the judge characterized the award as "generous," but ultimately found that "[i]t doesn't shock [his] conscience."

In order to overturn a jury's verdict or remit an award of compensatory damages, a reviewing court must give "due regard to the opportunity of the jury to pass upon the credibility of the

---

[5] As part of his analysis denying defendant's motion for a new trial, the judge noted plaintiff

> sat here with a Kippah, and yamaka on. I mean he is clearly orthodox . . . [I]t's an orthodox family. [I]t would not be surprising for a jury to recognize that having to have dinner in a bedroom over Passover, even though it's not the Seder, is indicative of something . . . somebody being in bad shape and that that has a ring of truth to it.

witnesses." R. 4:49-1(a); see also Johnson, supra, 192 N.J. at 281. The judge must be "'clearly and convincingly' persuaded that it would be manifestly unjust to sustain the award." Johnson, supra, 192 N.J. at 281. "The verdict must be 'wide of the mark' and pervaded by a sense of 'wrongness.'" Ibid. (internal citations omitted). We must conclude, by clear and convincing evidence, that the verdict "is so clearly disproportionate to the injury and its sequela (here plaintiff's pain and suffering and loss of enjoyment of life) that it may be said to shock the judicial conscience." Ibid.

Applying these high standards to the evidence presented in this case, we are satisfied that the jury's award of compensatory damages cannot stand. The record we have described at length shows this trial was saturated with incompetent, inadmissible opinion testimony from plaintiff that irreparably tainted the jury's ability to reach a sustainable verdict. Defendant's involuntary absence from the trial compounded this prejudice by leaving the jury without a countervailing account of the severity of the accident.

We reach this conclusion mindful that "we repose enormous faith in the ability of juries to equate damages with dollars to 'make the plaintiff whole, so far as money can do.'" He, supra, 207 N.J. at 248 (quoting Model Jury Charge (Civil) 8.11E

"Disability, Impairment and Loss of the Enjoyment of Life, Pain and Suffering" (December 1996)). We also reaffirm our duty to respect and whenever possible defer to the trial judge's "feel of the case" because "trial judges see much that juries do not." Mickens, supra, 438 N.J. Super. at 538-539 (quoting He, supra, 207 N.J. at 254). Most of all, we acknowledge our own shortcomings as reflected in the timeless wisdom of Chief Justice Hughes's admonition in Baxter, supra, 74 N.J. at 596-97:

> While sometimes difficult of application to a given factual base, these rules recognize that all judges, whether trial or appellate, are human and that the judgment of each is inevitably affected by subjective prejudices or predispositions relating to properties or specific tendencies of the individual mind, as distinguished from general or universal experience. These natural subjective inclinations derive from the particular background or experience of the individual judge, whether from tenure on the bench in examining or recalling other cases, from previous activity in law practice in diverse fields or, for that matter, from any human experience, such as a youthful background of poverty or wealth or the like. Such individuality of approach extends of course to the field of admeasuring damages flowing from injuries caused by negligence, as in the present case, or other wrong. It is for the merging of such individualized propensities of mind into an amalgam of common judicial experience related to the doing of justice that judges are admonished to resist the natural temptation to substitute their judgment for that of the jury.
>
> [(footnote omitted).]

Viewing the competent evidence presented at trial in the light most favorable to plaintiff, we are thoroughly convinced that allowing the jury's damage award to stand would constitute a clear miscarriage justice.  Furthermore, because defendant was wrongly denied her day in court, we also vacate the judge's directed verdict on liability.

Reversed and remanded for a new trial on both liability and damages.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-5273-13T3